1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  TAMI M. KRENZIN, State Bar No. 183925
   Supervising Deputy Attorney General
3  CHARITY S. WHITNEY, State Bar No. 285727
   Deputy Attorney General
4    2550 Mariposa Mall, Room 5090
     Fresno, CA  93721-2271
5    Telephone:  (559) 705-2314
     Fax:  (559) 445-5106
6    E-mail:  Charity.Whitney@doj.ca.gov
   *Attorneys for Respondent*

7

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **DALE WILLIAM WATSON,**          1:24-cv-00567-SKO

                              Petitioner,
14
                                       **ANSWER TO PETITION FOR WRIT OF**
15     v.                              **HABEAS CORPUS**

16  **STEPHEN SMITH,**

17                          Respondent.

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3

Introduction ....................................................................................................... 1

Statements ......................................................................................................... 1

4

Factual Background ........................................................................................... 3

5

For claims rejected by the state court, Federal Habeas relief is difficult to
    achieve .......................................................................................................... 8

6

Argument ....................................................................................................................... 9

7

    I.    The state court reasonably rejected Petitioner's claim that there was
        insufficient evidence of his competence to stand trial ............................. 9

8

        A.    The state court's reasoned decision on the insufficient-evidence-of-
            competence claim ....................................................................... 9

9

        B.    Clearly established competency principles ............................... 15

10

        C.    The state court reasonably found sufficient evidence supporting
            Petitioner's competence; because no Supreme Court authority

11

            dictates the standard for reviewing evidence of competence, the
            state court's determination could not be objectively unreasonable ......... 16

12

    II.    Petitioner's claim about a pinpoint instruction in his competency hearing
        presents no federal question; because there is no controlling Supreme Court

13

        authority, the state court's rejection could not have been unreasonable ............... 18

14

        A.    The state court's reasoned decision on the competency-instruction
            claim .......................................................................................... 18

15

        B.    The competence-instruction claim presents no federal question and
            could only have been reasonably rejected by the state court ................... 21

16

    III.    Petitioner's instructional claim is procedurally barred; alternatively, the
        state court reasonably rejected the claim on the merits. ........................ 22

17

        A.    The state court's reasoned decision on the self-defense instructions
            claim .......................................................................................... 22

18

19

        B.    Clearly established principles of instructional error ................. 24

20

        C.    Petitioner's claim cannot be considered on federal habeas because it
            was forfeited below .................................................................. 25

21

        D.    The state court's rejection of Petitioner's instructional claim was
            objectively reasonable ............................................................... 25

22

    IV.    Petitioner's complaint about his firearm allegation is a non-cognizable
        state-law claim ....................................................................................... 26

23

        A.    The state court's reasoned decision on the firearm allegation claim ........ 26

24

        B.    This is a non-cognizable state law sentencing claim ............................... 29

25

Conclusion ................................................................................................................... 30

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Akhtar v. Knowles*
   No. CIV S-03-2674MCEGGHP, 2009 WL 57619 (E.D. Cal. Jan. 9, 2009) .......................... 21

*Bonin v. Calderon*
   59 F.3d 815 (9th Cir. 1995)................................................................................................. 25

*Bradshaw v. Richey*
   546 U.S. 74 (2005) .............................................................................................................. 29

*Brown v. Davenport*
   596 U.S. 118 (2022) .............................................................................................................. 8

*Calderon v. Coleman*
   525 U.S. 141 (1998)............................................................................................................. 25

*Cullen v. Pinholster*
   563 U.S. 170 (2011) .............................................................................................................. 8

*Cupp v. Naughten*
   414 U.S. 141 (1973)............................................................................................................. 24

*Darrow v. Gunn*
   594 F.2d 767 (9th Cir. 1979)............................................................................................... 21

*Davis v. Ayala*
   576 U.S. 257 (2015) .............................................................................................................. 8

*Donnelly v. DeChristoforo*
   416 U.S. 637 (1974)............................................................................................................. 24

*Douglas v. Woodford*
   316 F.3d 1079 (9th Cir. 2003).............................................................................................. 17

*Drope v. Missouri*
   420 U.S. 162 (1975)............................................................................................................. 15

*Dusky v. United States*
   (1960) 362 U.S. 402 ............................................................................................................ 15

*Estelle v. McGuire*
   502 U.S. 62 (1991) ................................................................................................. 18, 21, 24

*Fairbank v. Ayers*
   650 F.3d 1243 (9th Cir. 2011).............................................................................................. 25

# TABLE OF AUTHORITIES
## (continued)

Page

*Godinez v. Moran*
    509 U.S. 389 (1993)........................................................................................... 15

*Harrington v. Richter*
    562 U.S. 86 (2011)........................................................................................... 8, 9

*Henderson v. Kibbe*
    431 U.S. 145 (1977)........................................................................................... 22

*Huu Thanh Nguyen v. Garcia*
    477 F.3d 716 (9th Cir. 2007)............................................................................ 21

*Johnson v. Williams*
    568 U.S. 289 (2013)........................................................................................... 9

*Langford v. Day*
    110 F.3d 1380 (9th Cir. 1996)...................................................................... 22, 29

*Lewis v. Jeffers*
    497 U.S. 764 (1990)........................................................................................... 29

*Lockyer v. Andrade*
    538 U.S. 63 (2003)............................................................................................ 22

*Mays v. Hines*
    592 U.S. 385 (2021)............................................................................................ 8

*Medina v. California*
    (1992) 505 U.S. 437............................................................................... 15, 16, 21

*Middleton v. McNeil*
    541 U.S. 433 (2004)........................................................................................... 24

*Miller v. Vasquez*
    868 F.2d 1116 (9th Cir. 1989).......................................................................... 30

*Pate v. Robinson*
    383 U.S. 375 (1966)........................................................................................... 15

*Paulino v. Castro*
    371 F.3d 1083 (9th Cir. 2004)........................................................................... 25

*People v. Bolton*
    (1979) 23 Cal.3d 208 ........................................................................................ 26

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Masterson*
    8 Cal. 4th 965 (1994) ............................................................................................... 21

*People v. Watson*
    No. F083283, 2023 WL 5496964 (Cal. Ct. App. Aug. 25, 2023) [ECF No. 11-
    44] ................................................................................................................... *passim*

*Sturm v. California Adult Auth.*
    395 F.2d 446 (9th Cir. 1967) ..................................................................................... 30

*Sully v. Ayers*
    725 F.3d 1057 (9th Cir. 2013) ................................................................................... 17

*Swarthout v. Cooke*
    562 U.S. 216 (2011) ................................................................................................... 29

*United States v. Sahhar*
    917 F.2d 1197 (9th Cir. 1990) ................................................................................... 21

*Vansickel v. White*
    166 F.3d 953 (9th Cir. 1999) ..................................................................................... 25

*Wainwright v. Sykes*
    433 U.S. 72 (1977) ..................................................................................................... 25

*White Hawk v. Solem*
    693 F.2d 825 (8th Cir. 1982) ..................................................................................... 21

*White v. Woodall*
    572 U.S. 415 (2014) ................................................................................................... 22

*Williams v. Diaz*
    No. 118CV01728SKOHC, 2019 WL 399223 (E.D. Cal. Jan. 31, 2019) ................... 30

*Woodford v. Visciotti*
    537 U.S. 19 (2002) ....................................................................................................... 8

**STATUTES**

Title 28 U.S.C.
    § 1368 ......................................................................................................................... 17
    § 2254 ......................................................................................................................... 29
    § 2254(a) ................................................................................................................. 8, 29
    § 2254(d) ................................................................................................................... 8, 9
    § 2254(e)(1) ................................................................................................................ 17

## TABLE OF AUTHORITIES
**(continued)**

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ................................................................................................ 30

v

**Introduction**

D.A., a minor, was probably using methamphetamine when Petitioner took her for a drive in his truck. During the drive, D.A. began damaging the truck. Watson drove to a park, forced D.A. out of the truck, then shot D.A., killing her. Before trial, Petitioner attempted to prove before a jury that he was incompetent. When a jury rejected his incompetence claim, Petitioner argued self-defense at trial. His criminal jury rejected this story, instead convicting him of second-degree murder.

Petitioner raises four claims attacking his convictions for the crime. The state courts reasonably rejected each of these claims. Several of his claims present no federal question. One is procedurally barred. None of his claims rose to the constitutional standards necessary for reversal on direct appeal—much less do any of them demand relief on federal habeas. Despite Petitioner's attempt to portray his trial and his competency hearing as error-filled, both proceedings were fair. This court should deny the Petition.

**Statements**

Respondent as Warden of Pleasant Valley State Prison answers the Petition for Writ of Habeas Corpus (ECF No. 1 ["Pet."]) as follows:

1. Respondent has custody of Petitioner, a prisoner, under the August 21, 2021, judgment of the California Superior Court, Tulare County, in case number PCF377332.

2. Petitioner must prove exhaustion. Petitioner presented his claims to the California Supreme Court in his October 4, 2023, Petition for Review.

3. Respondent denies that Petitioner is entitled to relief.

Respondent has lodged the following state-court records (ECF No. 11):

**California Court of Appeal, Case No. F083283**

1. Reporter's Transcript on Appeal, Vol. 1 of 28, pages 1-8.

2. Reporter's Transcript on Appeal, Vol. 1B[1] of 28, pages 26-31.

3. Reporter's Transcript on Appeal, Vol. 2 of 28, pages 32-38.

---

[1] Volumes 1A, 2A, 3A, 7A, and 27A are confidential *Marsden* transcripts to which Respondent is not generally entitled.

4.  Reporter's Transcript on Appeal, Vol. 2B of 28, pages 50-56.

5.  Reporter's Transcript on Appeal, Vol. 3 of 28, pages 57-62.

6.  Reporter's Transcript on Appeal, Vol. 3B of 28, pages 81-86.

7.  Reporter's Transcript on Appeal, Vol. 4 of 28, pages 87-99.

8.  Reporter's Transcript on Appeal, Vol. 5 of 28, pages 100-171.

9.  Reporter's Transcript on Appeal, Vol. 6 of 28, pages 172-241.

10. Reporter's Transcript on Appeal, Vol. 7 of 28, pages 242-246.

11. Reporter's Transcript on Appeal, Vol. 7B of 28, pages 257-280.

12. Reporter's Transcript on Appeal, Vol. 8 of 28, pages 281-315.

13. Reporter's Transcript on Appeal, Vol. 9 of 28, pages 316-349.

14. Reporter's Transcript on Appeal, Vol. 10 of 28, pages 350-376.

15. Reporter's Transcript on Appeal, Vol. 11 of 28, pages 377-416.

16. Reporter's Transcript on Appeal, Vol. 12 of 28, pages 417-421.

17. Reporter's Transcript on Appeal, Vol. 13 of 28, pages 422-427.

18. Reporter's Transcript on Appeal, Vol. 14 of 28, pages 428-438.

19. Reporter's Transcript on Appeal, Vol. 15 of 28, pages 439-443.

20. Reporter's Transcript on Appeal, Vol. 16 of 28, pages 444-456.

21. Reporter's Transcript on Appeal, Vol. 17 of 28, pages 457-578.

22. Reporter's Transcript on Appeal, Vol. 18 of 28, pages 601-747.

23. Reporter's Transcript on Appeal, Vol. 19 of 28, pages 751-886.

24. Reporter's Transcript on Appeal, Vol. 20 of 28, pages 901-998.

25. Reporter's Transcript on Appeal, Vol. 21 of 28, pages 1051-1077.

26. Reporter's Transcript on Appeal, Vol. 22 of 28, pages 1101-1172.

27. Reporter's Transcript on Appeal, Vol. 23 of 28, pages 1201-1234.

28. Reporter's Transcript on Appeal, Vol. 24 of 28, pages 1251-1400.

29. Reporter's Transcript on Appeal, Vol. 25 of 28, pages 1401-1461.

30. Reporter's Transcript on Appeal, Vol. 26 of 28, pages 1501-1581.

31. Reporter's Transcript on Appeal, Vol. 27 of 28, pages 1601-1607.

32. Reporter's Transcript on Appeal, Vol. 27B of 28, pages 1619-1625.

33. Reporter's Transcript on Appeal, Vol. 28 of 28, pages 1701-1723.

34. Clerk's Transcript on Appeal, Vol. 1 of 4, pages 1-297.

35. Clerk's Transcript on Appeal, Vol. 2 of 4, pages 298-597.

36. Clerk's Transcript on Appeal, Vol. 3 of 4, pages 598-897.

2

37. Clerk's Transcript on Appeal, Vol. 4 of 4, pages 898-904.

38. Augmented Clerk's Transcript on Appeal, Vol. 1 of 1, pages 1-41.

39. Confidential Clerk's Transcript on Appeal, Vol 1 of 1, pages 1-297.

40. Confidential Supplemental Clerk's Transcript on Appeal, pages 1-48.

41. Appellant's Opening Brief.

42. Respondent's Brief.

43. Appellant's Reply Brief.

44. Opinion issued by 5DCA on August 25, 2023.

**California Supreme Court, Case No. F083283**

45. Appellant's Petition for Review.

46. Order Denying Petition for Review.

**California Superior Court, Tulare County, Case No. PCF337332**

47. Amended Abstract of Judgment.

**Factual Background**

The state court of appeal summarized the facts and procedural history as follows:

> In March of 2019, Jacqueline R. was living and working at Hales Cottage Motel in downtown Tulare on K Street. The motel was known to police for drug sales and prostitution.
>
> Jacqueline R.'s "son's cousin," D.A., visited Hales Cottage occasionally, and she was there on the night of March 2, 2019, helping Jacqueline R. paint a room Jacqueline was moving into. D.A. left and went to another motel room, where Joshua L. lived. Joshua L. had known D.A. since she was a baby. D.A. spent the night in Joshua L.'s room, sleeping on a chair.
>
> Joshua L. recalled D.A. "acting out" and being "irate" the next morning, March 3. Jacqueline R. and Joshua L. tried to calm D.A. down, but she was telling people to leave her alone. When D.A. did calm down, Joshua L. returned to his room, and D.A. stayed with Jacqueline R.
>
> Later that morning, Jacqueline R. noticed a truck pull into the motel area, leave, and then return. The driver, whom Jacqueline R. identified as Watson, asked her if she was a prostitute. Jacqueline R., who had never seen Watson before, asked him why he was there. Watson said he was looking for a "girl" or "friend." When Jacqueline R. asked for her name, Watson would not say.
>
> The motel manager came out and spoke to Jacqueline R., Watson, and D.A., who was also there. D.A. jumped into Watson's truck, although Jacqueline R. told Watson not to let her do so. D.A. and Watson drove away. Jacqueline R. testified that D.A. was not being violent at the time, and denied telling Detective Van Curen that D.A. was acting like she was high on methamphetamine.
>
> At around 8:00 or 8:30 a.m. on March 3, Christopher G. was driving northbound on Freeway 99 when his truck broke down, near Elk Bayou Park. As he

3

was working on his truck at the side of the road, he heard a pickup drive by, but paid no attention to it. About five or six minutes later, he heard a gunshot or two—he thought the second sound might have been the recoil. Christopher G. then saw a truck, brown in the front and yellow in the back with a brown toolbox, later identified as Watson's truck, leave the area after the shooting.

Watson's girlfriend, April O., had known Watson for 35 years and dated him for 11 years. In March 2019, April O. was living with her father, but regularly stayed at Watson's mobile home off Highway 190 in Poplar, south of Tulare. Watson drove a dark brown and beige GMC pickup truck. On the night of Friday, March 1, April O. spent the night with Watson and he dropped her off at her father's house around noon the following day, and she did not see him again until Sunday (March 3) in the late afternoon, early evening. Watson had called April O. at around 11:00 a.m. that day and said he was going to get a weed eater to clean up the property where he lived.

April O. saw Watson again on Monday, March 4, at work when she took him to lunch. Watson's mustache had been shaved off, but April O. claimed he did that periodically. Watson made no mention of getting into a fight.

When April O. saw Watson on Tuesday, March 5, his truck had been painted with primer. April O. had seen Watson with a pistol in 2017, and she had previously seen him at a hotel in Tulare without her at the beginning of their relationship. April O. did not recall telling a police officer that she found an "adult finder" on Watson's phone. April O. acknowledged that Watson used methamphetamine off and on during their relationship. She was not certain, but thought that, in March of 2019, he was using every day. When Watson came down from the drug, he would act like a child and throw a tantrum, be mad, and slammed things around. She admitted Watson would sometimes get violent when he was coming down from methamphetamine, but she never saw him violent towards anyone.

### ***Police Investigation***

At about 5:23 p.m. on March 3, 2019, Police Officer Jose Valencia was dispatched to the area of Elk Bayou Park located just off Highway 99, south of Hales Cottage Motel, regarding a possible gunshot victim. When he arrived, he saw a body on the ground, and he made contact with Eric F., who had been riding his dirt bike when he discovered the body and called police. Officer Valencia spoke to Eric F., who reported he found the victim with no one around. The victim, later identified as D.A., had suffered a gunshot wound to the torso and was found lying on a dirt access road.

Officer Cynthia Vasquez arrived shortly thereafter and searched the scene. No shell casings were found and there were no percipient witnesses present. A notepad, methamphetamine pipe, a lighter, a lottery ticket, and the blade of a utility knife were found two to three inches from D.A. D.A. had bruising and marks on her neck and left hand and injury to her fingers. Fresh tennis shoe and oversized tire tracks were found in the mud area near the body.

Chief Deputy Coroner Alan Knight examined D.A.'s body at the scene and found no signs of strangulation. Knight opined D.A. had died within eight to 12 hours prior to his inspection.

Dr. Garry Walter conducted an autopsy of D.A. and concluded she died of a single perforating gunshot wound to the chest with entry and exit wounds. She had a third wound on the left hand.

4

Dr. Othon Mena reviewed Dr. Walter's report, the toxicology report, multiple police reports, and photographs of the autopsy and death scene, and opined D.A.'s shooter had been a few inches to more than a few feet away when the gun was fired. He opined D.A. died within minutes of being shot, and the bone fracture on her left hand could also have been the result of a gunshot wound. Dr. Mena opined the bullet to be in the .30- to .40-caliber range. He saw no signs of the bullet hitting something before it struck the body.

Retrieved surveillance videos showed Watson's truck at about 8:20 a.m. on March 3, going southbound just west of Highway 99, towards where D.A.'s body was found. Video footage from a mobile home that faced Elk Bayou Park showed Watson's truck driving slowly in the early morning hours. And a surveillance video from Hales Cottage at 8:14 a.m. on March 3, shows Jacqueline R., D.A., Watson, and the owner of the motel. D.A. is also seen talking to an unknown man who was staying at the motel and then getting into Watson's truck.

Police spoke with Fausto Hernandez, the owner of G&M Auto where Watson worked. While there, Sergeant Kenneth Jones found a can of primer and a new jacket that was later identified as belonging to Watson. Hernandez told Sergeant Jones that he helped Watson paint his brown or gold C10 truck to a flat green color, because Watson told him he got into "a little trouble with some guy" and wanted to paint it. Watson also borrowed a weed eater to clean up his yard. Watson rented trailer space in front of Hernandez's house in Poplar.

### ***Watson's Post-Arrest Statements***

Watson was taken into custody on March 5, and interviewed twice by police. Both interviews were played for the jury.

During the first interview, Watson was read his *Miranda* [fn. omitted] rights and stated that he had been using methamphetamine at a truck stop between Tulare and Tipton on Saturday evening (March 2, 2019), and decided to drive to Hales Cottage to buy more. While there, Watson ran into a big "black lady" who sold him some drugs and asked him to help her move some "stuff," when D.A. came up "raising hell." Watson helped the woman move her furniture, but D.A. was adamant about being given a ride to the store and jumped into his truck. The woman told D.A. to get out of the truck and leave, but she refused.

Watson stated he did not want any problems and decided to take D.A. to Love's Truck Stop and get rid of her. But when they got there, D.A., who had been smoking methamphetamine in the truck, refused to get out. D.A. said she needed to make some money and threatened to take Watson's truck while holding a razor blade.

When Watson saw a car pull up that he had seen earlier at the motel, he took off with D.A. still in the truck. Watson took D.A. to a park and tried to get her out of the truck. D.A. cut the truck's seat and seat belt while he physically removed her from the truck, stating he "feared for [his] life." After he removed D.A. from the truck, Watson took off. While backing up, he thought he ran over her because he was "driving as fast as [he] fucking [could]."

Watson denied having a gun or shooting D.A., and, if he had, "[I]t would have been self-defense," as she had a razor blade and was trying to hurt him. Watson described seeing D.A. fighting with the "big lady" at the motel, and kicking at the passenger door and slamming the driver's door of his truck. He also recounted that D.A. threatened to take his truck or have her "man" take it. Watson said "that girl

5

was evil. There was lot of people probably wanted to kill that bitch."

Watson acknowledged being a felon, but reiterated that, even if he shot D.A. it would be self-defense because she tried to hurt him with a razor blade. Watson claimed to be surprised when he learned D.A. had died, and was adamant that, when he left her, she was yelling at him and he did not shoot her. Watson alleged that he primered his truck because it needed to be repainted.

Watson was interviewed a second time the following day. Watson related the same account of giving D.A. a ride and her then refusing to get out of his truck, and that she pulled a razor blade and threatened to take his truck. Watson said he left Love's with D.A. when he saw the same vehicle at Love's that he had seen at Hales Cottage and thought it was D.A.'s pimp or boyfriend trying to steal his truck. While they were driving, D.A. grabbed a fork from the dash and began damaging the dash of his car with the razor and the fork. He stopped on a dirt road next to the park and yelled at D.A. to get out.

D.A. refused to get out. Watson got out of the driver's side and tried to open the passenger door. But D.A. had locked the door, so Watson ran back to the driver's side, which was still open, to retrieve his keys. On his way, he grabbed a gun he had hidden under his toolbox. Again inside the truck, Watson held the gun and told D.A. to get out. D.A. lunged at him. Watson grabbed D.A.'s hand and reached over to the passenger door to open it and push her out. D.A. tried to hit or cut him as he did so. Although D.A. continued to resist and fight, Watson managed to push her out of the truck when she lunged at him again and the gun went off accidently. Watson thought the first shot hit the truck door because, after he pushed her out, D.A. was standing outside the passenger door laughing and cutting his seat belt with the razor blade.

D.A. yelled at Watson and threatened that he was "a dead motherfucker." Watson pulled the trigger the second time to scare her, as he saw "some fucking psycho bitch trying to kill me and take my truck." Watson had no idea D.A. had died until police told him; he did not think he had hit her. Watson admitted there was a couple of seconds between shots, but he did not point the gun at her, only towards her. Watson explained that, after the first shot, his truck would not start and when D.A. started coming after him, he thought she would kill him. Watson pulled the trigger the second time because D.A. was trying to kill him and he wanted to "scare the bitch."

Watson explained that he initially lied to police about the shooting because he was scared. He believed he acted in self-defense because D.A. was threatening him with a weapon. Watson denied painting his truck or shaving his mustache to hide from police. He did not think of calling police because he is a felon with a gun. Watson did not see D.A. lying on the ground. Watson sold his gun, but would not say who he sold it to, stating, "The gun's gone."

### _Forensic Evidence_

When Watson was taken into custody, he had abrasions or scratch marks on the top of his left hand. No expended casings or ammunition was found where D.A.'s body was discovered. It was opined that the tires on Watson's truck had the same tire design and size as the tire impressions taken from the crime scene.

D.A.'s DNA was found on the razor blade discovered at the scene and tested presumptive positive for blood. Watson's DNA was not found on the razor. D.A.'s DNA was eliminated from the sperm and non-sperm factions from penile samples taken from Watson's sexual assault kit. There was no semen found on the samples

6

taken from D.A.'s assault exam. Watson's DNA was found on a pair of jeans found in his truck, which tested presumptive positive for blood.

Three particles, one characteristic of gunshot residue (GSR) and two consistent with GSR were found on the back of Watson's jacket. No GSR samples were taken from the inside of Watson's truck and no analysis of a GSR residue stub obtained from inside the truck was tested.

### *Defense Case*

Kenton Wong, a senior forensic scientist at the Forensic Analytical Crime Lab in San Francisco, testified as an expert for the defense. He reviewed Department of Justice reports regarding GSR in this case, but found nothing "remarkable." Wong also reviewed the report that mentioned collection of GSR from Watson's jacket and found it was not consistent with what would typically be found when a gun is fired, which would show a "plume" of thousands of residue particles. Instead, he found the particles more consistent with contamination from GSR.

Wong opined that the toxicology report for D.A. showed that, at the time of her death, the amount of methamphetamine in her system was "indicative of someone who was intoxicated and under the influence." An individual with that level of the drug would experience "extreme anxiety, maybe paranoia, [and] confusion," and could act aggressively and violently.

Psychologist Doriann Hughes conducted an evaluation of Watson on September 20, 2019, and diagnosed him with bipolar disorder, which is characterized by cycling episodes of manic behavior and depressive symptoms. When she evaluated Watson, he was displaying symptoms of mania, meaning his mood was elevated and his thoughts racing, irrational, and paranoid. Dr. Hughes opined that people with bipolar disorder do not process information in time to react to a situation like a perceived threat, but instead their body is already preparing to respond to the threat before thinking it through. Dr. Hughes explained that, for someone who is bipolar, the stressful event is viewed through the lens of psychosis or paranoia so that decision making is short-circuited.

Mariana Hernandez testified that she worked at the Quick Trip in March of 2019, where D.A. was a frequent customer, often with Raul, who also went by Salvador or Chaba. The day before D.A. died, Hernandez overheard Raul threatening to kill her. Raul was under the influence and talking nonsense, a regular occurrence.

Maby Gomez also worked at the Quick Trip and knew D.A. and Raul, who was described as D.A.'s boyfriend, as frequent customers. On March 2, 2019, Gomez overheard Raul call D.A. a "fucking black woman" who did not know what he was capable of doing.

Defense investigator Wayne Autry spoke with witness Christopher G. about his car breaking down on the side of the road. Although Christopher G. had testified that his Ford F-150 broke down, he told Autry it was a semi-tractor truck. In addition, Christopher G. told Autry he heard only one gunshot.

*People v. Watson*, No. F083283, 2023 WL 5496964, at *1–5 (Cal. Ct. App. Aug. 25, 2023) [ECF No. 11-44].

7

**For claims rejected by the state court, Federal Habeas relief is difficult to achieve**

Custody in violation of the Constitution, laws, or treaties of the United States is the only ground for filing a federal petition for the writ of habeas corpus. 28 U.S.C. § 2254(a). Section 2254(d) further places limitations on a federal court's power to grant a state prisoner's federal habeas petition. *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). It "bars relitigation of any claim 'adjudicated on the merits' in state court" subject to two narrow exceptions. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). These exceptions require that petitioner show the state court's adjudication of the claim was either (1) "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or (2) "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* at 97–98 (quoting § 2254(d)). In other words, a petitioner's burden is to demonstrate that the state court's merits adjudication of his claim was objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). An objectively unreasonable ruling is one that "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The question is not whether the state court's holding was wrong, but whether it was reasonable. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. What matters is whether the state court "managed to blunder so badly that every fairminded jurist would disagree." *Mays v. Hines*, 592 U.S. 385 (2021).

Even if there was error, to earn relief a petitioner still must show prejudice. Where the state court adjudicated the claim on the merits, a petitioner must show that the harmlessness determination itself was unreasonable. § 2254(d); *Brown v. Davenport*, 596 U.S. 118 (2022). And the habeas petitioner must convince the federal court that the error caused actual prejudice. *Davis v. Ayala*, 576 U.S. 257 (2015); *Davenport*, 596 U.S. 118. In other words, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Davenport*, 596 U.S. 118.

1    As the Supreme Court remarked, "If this standard is difficult to meet, that is because it was

2    meant to be. . . Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme

3    malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction

4    through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5

5    (1979)). This difficult standard "sharply limits the circumstances in which a federal court may

6    issue a writ of habeas corpus to a state prisoner whose claim was 'adjudicated on the merits in

7    State court proceedings.'" *Johnson v. Williams*, 568 U.S. 289 (2013).

8                                          **ARGUMENT**

9    **I.    THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THERE WAS
         INSUFFICIENT EVIDENCE OF HIS COMPETENCE TO STAND TRIAL**

10

11    Before trial, Petitioner put the question of his competency before a jury. The jury found he

12    was competent to stand trial. On direct appeal, Petitioner claimed that there was insufficient

13    evidence to support the jury's finding. The state court disagreed.

14    Petitioner repeats this claim on federal habeas, contending in particular that the evidence

15    conclusively showed he was unable to assist his counsel with his defense in a rational manner. He

16    does not contend that the state court unreasonably determined the facts, but asserts that the

17    California Court of Appeal's opinion was objectively unreasonable under the Due Process clause.

18    (Pet. 17-22.) His contention fails. The state court's denial of this claim was objectively

19    reasonable.

20    **A.    The state court's reasoned decision on the insufficient-evidence-of-competence
         claim**

21

22    In a reasoned opinion, the California Court of Appeal rejected Petitioner's claim that there

23    was insufficient evidence of his competency. The court wrote:

24    **I. WAS THERE INSUFFICIENT EVIDENCE WATSON WAS
      COMPETENT TO STAND TRIAL?**

25            Watson contends there is insufficient evidence to sustain the jury's
      determination of competency, thus the jury's findings and the judgment of

26    conviction must be reversed. We disagree.

27            ***Pretrial Proceedings***
              As stated above, on September 6, 2019, over Watson's objection, defense

28    declared a doubt as to Watson's competence and criminal proceedings were

                                                9

suspended. ([Cal. Penal Code] § 1368.) That same date, Drs. Dorian Hughes and Brandi Mathews were appointed, pursuant to sections 1367 and 1368, to examine Watson. They submitted conflicting reports regarding Watson's competency. On October 4, 2019, Watson was re-referred to Dr. Mathews for a supplemental report.

On November 8, 2019, the trial court granted a defense motion for a competency trial with the preliminary issue of Watson's competence to stand trial to be tried by a jury. Specifically, the issue was whether Watson could rationally assist his counsel in his defense.

A competency trial, with jury, was held January 2-3, 2020, finding Watson competent to stand trial.

### ***Testimony at the Competency Trial***
#### ***1. Testimony of Doriann Hughes***

Dr. Hughes, a consultant psychologist for the Department of State Hospitals, testified that she was assigned to evaluate Watson and whether he could "understand the charges against [him], understand the proceedings against [him], and can work with [his] attorney in a rational capacity ...." Dr. Hughes conducted the 90-minute long evaluation on Watson on September 20, 2019, at which point she determined he was incompetent to stand trial.

Dr. Hughes testified that Watson's interview lasted a bit longer than normal because of the "difficulty in conducting the interview," stating it took a "really long time to get information from him and keep him focused on the questions." As part of the evaluation, Dr. Hughes conducted the "FIT-R" an instrument to evaluate competency to stand trial. The FIT-R looks at an individual's knowledge of the legal system, their understanding of consequences, and ability to communicate with counsel. Dr. Hughes opined that Watson's "most concerning area," was his ability to communicate with counsel, as he expressed "really irrational thinking."

Dr. Hughes also conducted a mental status examination and behavioral observation. Dr. Hughes testified that areas of concern were his ability to communicate, which jumped from topic to topic, and he was "quite expansive in his mood, so some mood instability." Dr. Hughes observed Watson to be "very animated and euphoric" throughout the interview, and she ascribed a diagnosis of bipolar disorder. Watson had reported a history of some mental health treatment, a history of depression, suicide, elation, and at one point had been reported having been diagnosed as bipolar.

Dr. Hughes did not conduct a malingering assessment of Watson because she did not think that was happening. Watson presented no indicators that lead her to believe that he was malingering.

Dr. Hughes testified that individuals with bipolar disorder benefit from medication, often within four to six weeks. Dr. Hughes did not find Watson competent to stand trial because, at the time she met with him, he was not taking medication, and was exhibiting symptoms that would impact his ability to work with his counsel in a coherent manner. Dr. Hughes recommended that Watson receive treatment competency training, which involved, in his case, primarily medication. Dr. Hughes again opined that Watson had difficulty communicating and also had a "significant distrust for his defense team."

On cross-examination, Dr. Hughes testified that Watson "did well" on the

10

first prong of the FIT-R, as he understood the court process—what he was charged with, what everyone's roll in the courtroom was, on the consequences he was facing. Watson discussed possible defenses to his case and offered different scenarios as to what he thought could have happened.

Dr. Hughes was concerned with Watson's distrust of and "irrational beliefs" about his attorney. Dr. Hughes acknowledged that someone could be diagnosed with bipolar disorder, depression, or be suicidal and still be competent to stand trial. She also acknowledged that Watson showed no signs of talking to someone who was not there or having hallucinations, and he was cognizant of his surroundings.

When asked if Watson had mentioned that he "tried to fire his attorney," Dr. Hughes testified that Watson had said he tried to fire him or wanted to fire him, but Dr. Hughes did not recall if Watson had actually gone through the process. Dr. Hughes knew such a procedure was known as a *Marsden* hearing. Following a sidebar, the People requested that the trial court take judicial notice and the court informed the jury of the fact that Watson had brought two *Marsden* hearings—one on September 6, 2019, and one on June 26, 2019—and both were denied. After the statement to the jury, Watson offered that there had been three *Marsden* hearings, not two.

Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Watson had also told her he was upset at his attorney because the attorney had not checked into his alibi. Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said understood that it was important to discuss that with his attorney. He also understood that it was important for him to use proper decorum in the courtroom.

Dr. Hughes also could not rule out a diagnosis of a neurocognitive disorder based on a previous head trauma. Dr. Hughes acknowledged that Watson's methamphetamine use could affect his mental health issues.

### 2. Testimony of Brandi Matthews

Brandi Matthews, a licensed psychologist with the State of California as well as in private practice, was hired in her private capacity to evaluate Watson twice. Dr. Matthews's opinion after her second evaluation of Watson was that he was not able to assist counsel in a rational manner. According to Dr. Matthews, Watson appeared to understand her questions and provide relevant responses the first time she evaluated him. She described him as "goal directed," "calm and cooperative." The second time, when he began discussing various aspects of his case, he became very "loud," "very agitated," and exhibited "mood liability"—a rapid shift or change in mood. During the second interview, Dr. Matthews also noticed statements with underlying theme of paranoia related to the case, claiming a conspiracy against him and his family in Tulare County. Specifically, Watson thought the sheriff investigator on the case was leading a drug business at a hotel. And he believed there were pages missing in the police report that would be helpful to him.

Dr. Matthews stated that she did not administer any standardized evaluations of Watson during either interview. Dr. Matthews arrived at "diagnostic impressions," but not a "specific diagnosis." Dr. Matthews opined that Watson

11

appeared to exhibit mood symptoms consistent with bipolar disorder, and had a "level of loss of touch with reality." He had difficulty remaining on topic during the 45-minute session.

Dr. Matthews acknowledged that Watson understood the charges against him and the consequences of being found guilty, he understood roles of courtroom personnel, and understood legal options. However, Dr. Matthews opined that Watson was not competent to stand trial because he was not able to assist counsel in a rational manner due to his psychiatric symptoms. Dr. Matthews cited Watson's belief that defense counsel was part of a conspiracy, and that he was innocent and did not think anyone was "working with him."

Dr. Matthews testified that the primary treatment for bipolar disorder would be psychotropic medication. Dr. Matthews also discussed competency restoration programs, which could be administered in a state hospital or jail.

On cross-examination, Dr. Matthews was first asked about her first evaluation of Watson, which took place on September 13, 2019. At that point, Watson was "linear in thought." During that interview, Watson understood plea bargaining, the difference between a jury and court trial, and appropriate courtroom behavior. Dr. Matthews opined that, at that point, Watson was able to assist his attorney in conducting his defense. While she noted that Watson would continue to pose a challenge for his attorney, there was no evidence the difficulties were linked to psychotic symptoms.

After the first interview, Dr. Matthews received additional information about Watson from defense attorney and received multiple interviews with defense attorney's social worker. During the second interview on November 1, 2019, Watson spoke more about the facts of his case and the fact that he believed his attorney was not looking into possible defenses. Dr. Matthews did not see any signs of malingering on Watson's part.

In Dr. Matthew's second interview, Watson talked about the fact that he was being slandered on the sheriff's department Web site. Dr. Matthews acknowledged that it was not uncommon for a criminal defendant to fear or feel unnerved when in custody with the status of their case.

### 3. Testimony of Joshua Nelson

Joshua Nelson, a correctional deputy at the Bob Wiley Detention Facility, testified that he had weekly contact with Watson within the past year while he was an inmate there. Nelson never talked to Watson about his criminal case, nor had he heard Watson discuss it with other inmates. Nelson had not heard Watson scream or yell for no reason, and he had never been disrespectful towards Nelson.

### 4. Testimony of Aaron Panttaja

Aaron Panttaja, a correctional deputy at Bob Wiley Detention Facility, testified that he saw Watson on a daily basis for the past three months and had never seen him act out towards him or other staff or have outburst or yell. Panttaja observed Watson having what seemed like casual conversations with other inmates, and he had never heard him talk about his case to other inmates. Neither had he heard Watson talk about his attorney to any other inmate and he had received no complaints from other inmates about Watson's behavior.

### 5. Testimony of Miguel Franco

Miguel Franco, a detective with the Tulare County Sheriff's Office, testified that he had contact with Watson in March of 2019 and obtained a small bindle of

12

methamphetamine from his person. Franco told Watson he was going to destroy it and he would not be charged with it. Franco testified that the sheriff's department put "vague information" on social media about Watson in an effort to get the public's assistance on further details of the crime.

### *Applicable Law and Standard of Review*

"As a matter of due process, '[a] defendant may not be put to trial unless he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' " ' (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354, quoting *Dusky v. United States* (1960) 362 U.S. 402) (*Dusky*).).)." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 386 (*Buenrostro*).) "A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).)" (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*).)

"The law presumes a person is competent to stand trial. ( ... § 1369, subd. (f).) 'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' (*People v. Mendoza* (2016) 62 Cal.4th 856, 871 [(*Mendoza*)]; see ... § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 446 ... [allocation of the burden of proof to a criminal defendant to prove incompetence does not violate procedural due process].)" (*Buenrostro, supra*, 6 Cal.5th at p. 387.)

Watson contends there is insufficient evidence to support the jury's verdict finding him competent to stand trial. Citing *People v. Samuel* (1981) 29 Cal.3d 489, Watson argues that a judgment of conviction must be reversed when there is "persuasive and virtually uncontradicted" evidence of a defendant's mental incompetence (*id.* at p. 506). We agree with that statement. He then asserts that the evidence in this case, which he contends was unanimous expert testimony contradicted only by lay testimony, is "persuasive and virtually uncontradicted" evidence of his mental incompetency. We disagree.

We apply "a deferential substantial evidence standard of review." (*Mendoza, supra*, 62 Cal.4th at p. 871.) When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial. (*Id.* at pp. 871-872, citing *People v. Marks* (2003) 31 Cal.4th 197, 219. fn. 3.) "In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence. [Citation.] Evidence is substantial if it is reasonable, credible, and of solid value." (*Marshall, supra*, 15 Cal.4th at p. 31.)

"Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial

13

evidence to support" ' the jury's verdict." (*Zamudio*, at p. 357.)

Here, substantial evidence supports the jury's verdict finding Watson competent to stand trial. The jury did not have to accept the opinion of experts. As our Supreme Court has observed: " 'Of course, the jury is not required to accept at face value a unanimity of expert opinion: "To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by jury...." ' " (*Marshall, supra*, 15 Cal.4th at p. 31.)

The value of an expert's opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the conclusion. (*Slaten v. State Bar* (1988) 46 Cal.3d 48, 55; *People v. Samuel, supra*, 29 Cal.3d at p. 498.)

Here, both of Watson's expert witnesses, Dr. Hughes and Dr. Matthew, based their opinions regarding Watson's competence to stand trial primarily on their interviews with Watson. Dr. Matthews's opinion changed from finding Watson competent after the first interview to incompetent after the second interview, which took place after she had a conversation with defense attorney and she reviewed multiple interviews with Watson's attorney's social worker.

Both experts agreed that Watson was able to understand the nature of the proceedings against him—the charges he was faced with and the role of the attorneys, judge, witnesses, and jurors. The argument on appeal is that the jury received evidence from which it should have found Watson incompetent as he was unable to assist his counsel in the conduct of a defense in a rational manner. However, there was also evidence of Watson's ability to work with counsel at trial—if he wanted to—to support the jury's verdict of competency. While Watson expressed anger and frustration with his attorney for not doing what he wanted him to do, he did not exhibit irrational thinking or inability to assist in his defense. Watson had, by his own calculations, attempted three times to dismiss his attorney.

The two deputy correctional officers at the detention facility where Watson was housed testified to no abnormal behavior on Watson's part in that setting. Both had continued contact with Watson.

In *People v. Samuel, supra*, 29 Cal.3d 489, our Supreme Court reversed for insufficiency of evidence a jury's verdict finding the defendant in that case competent to stand trial. But *Samuel* is factually distinguishable from this case. In *Samuel*, five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified that the defendant was incompetent to stand trial. This testimony was supported by four psychiatric reports, and the prosecution's witnesses did not contradict any of the defense testimony. (*Id.* at pp. 497–498.)

Here, in contrast, only two defense experts testified regarding Watson's incompetence to stand trial. As set forth above, their opinions were somewhat tenuous. Both experts opined that Watson was not able to adequately communicate with his defense counsel and therefore unable to assist counsel in his defense. Watson had complained to both experts that counsel was not listening to him and did not follow through on his suggestions for his defense. Dr. Hughes testified that Watson told her he was upset at his attorney because the attorney had not checked into his alibi. However, Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said he understood that it was important to discuss that with his

14

attorney. He also understood that it was important for him to use proper decorum in the courtroom. Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Dr. Hughes agreed that it was "difficult" at times how to distinguish between someone who is choosing not to work with their attorney and someone who has a mental disorder affecting their inability to do so.

In support of her opinion that Watson could not assist in his defense, Dr. Matthews cited the fact that Watson believed defense counsel was part of a conspiracy, as was the sheriff's department, and that Watson believed he was innocent and did not think anyone was "working with him."

Watson's dispute with his attorney over how to handle his case does not invalidate his competency to stand trial. In *People v. Hightower* (1996) 41 Cal.App.4th 1108, the court rejected a defendant's contention that "his disruptive behavior in the courtroom and disputes with defense counsel prove that he was not competent to stand trial." (*Id.* at p. 1112.) The court in Hightower reasoned, "His conduct demonstrates an unwillingness to cooperate with defense counsel but does not constitute proof of mental incompetence. '[T]he test, in a section 1368 proceeding, is competency to cooperate, not cooperation.' " (*Hightower*, at p. 1112, italics added; accord, *People v. Clark* (2011) 52 Cal.4th 856, 893.)

We conclude the evidence presented to the jury was sufficient to support the jury's verdict that Watson was competent to stand trial.

*People v. Watson*, No. F083283, 2023 WL 5496964, at *5–11 (Cal. Ct. App. Aug. 25, 2023) [ECF No. 11-44].

**B.    Clearly established competency principles**

A defendant may not be subjected to trial if he is incompetent. *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *Pate v. Robinson*, 383 U.S. 375, 377 (1966). To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and have "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

A state's competency procedure may presume that the defendant is competent to stand trial, and may place the burden of showing incompetence on the defendant. *Medina v. California*, 505 U.S. 437, 453 (1992). The Supreme Court has not established any specific test for reviewing the sufficiency of the evidence of competency; nor has it established other particular procedures for

15

1   determining competency. Rather, "it is enough that the State affords the criminal defendant on

2   whose behalf a plea of incompetence is asserted a reasonable opportunity to demonstrate that he

3   is not competent to stand trial." *Medina*, 505 U.S. at 451.

4        **C.    The state court reasonably found sufficient evidence supporting Petitioner's**
             **competence; because no Supreme Court authority dictates the standard for**
5            **reviewing evidence of competence, the state court's determination could not be**
             **objectively unreasonable**
6

7        The California Court of Appeal surveyed all the evidence that supported the jury's finding

8   that Petitioner was competent. It found, under California's standard, that there was sufficient

9   evidence to support the jury's factual finding. This analysis was reasonable. Additionally, no

10  Supreme Court case addresses the precise standard for assessing the sufficiency of evidence for

11  finding a defendant incompetent. Thus, the state court could not have acted contrary to or

12  unreasonably applied precedent that does not exist. Finally, because there is an absence of federal

13  law on point, the state court relied on state standards to reject Petitioner's claim. This Court may

14  not disturb the California courts' rulings on California law. For all of these reasons, Petitioner's

15  claim fails.

16       The state court was reasonable to determine that sufficient evidence supported the jury's

17  competence finding. The evidence shows that while Petitioner was "angry" and "frustrated" with

18  his attorney, he was capable of rationally assisting in his defense. Petitioner "by his own

19  calculations, attempted three times to dismiss his attorney." *Watson*, 2023 WL 5496964, at *10

20  [ECF No. 11-44]. This astute legal maneuvering evinced Petitioner's capacity to rationally assist

21  his attorney. The correctional officers who were familiar with Petitioner's daily behavior testified

22  that he did not act abnormally. Even the experts who proffered opinions of his incompetence

23  testified of Petitioner's ability to rationally understand and assist in executing a defense strategy:

24  "Watson had complained to both experts that *counsel was not listening to him and did not follow*

25  *through on his suggestions for his defense*. Dr. Hughes testified that Watson told her he was upset

26  at his attorney because the attorney *had not checked into his alibi*." *Watson*, 2023 WL 5496964,

27  at *10 (emphasis added) [ECF No. 11-44]. And, one of the experts testified that Petitioner's claim

28  of incompetence could have been malingering: ". . . [Petitioner said] if he committed the crime as

16

1   alleged, *he would say he was crazy because he could get less time.* . . . it was 'difficult' at times []

2   to distinguish between someone who is *choosing not to work with their attorney* and someone

3   who has a mental disorder affecting their inability to do so." *Watson*, 2023 WL 5496964, at \*10

4   (emphasis added) [ECF No. 11-44]. The state court summarized this evidence as supporting the

5   jury's finding of "Watson's ability to work with counsel at trial—if he wanted to[.]" *Watson*,

6   2023 WL 5496964, at \*10 (emphasis added) [ECF No. 11-44]. Put another way, the fact that

7   Petitioner did not *want* to assist counsel does not mean he was *incapable* of assisting counsel.

8   *Watson*, 2023 WL 5496964, at \*11 (emphasis added) [ECF No. 11-44] ("'[T]he test, in a section

9   1368 proceeding, is *competency to cooperate*, *not cooperation*.'" Emphasis original.) This

10  analysis of the evidentiary support for the jury's determination is reasonable on its face. *E.g.,*

11  *Sully v. Ayers*, 725 F.3d 1057, 1071 (9th Cir. 2013) (state court competency determination not

12  objectively unreasonable where petitioner's alternative theories of evidence, opinions on trial

13  strategy, and other trial testimony "strongly undermines any claim that [he] was incompetent");

14  *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (state court competency determination

15  not objectively unreasonable where petitioner had "coherent, responsive, and quite articulate"

16  *Marsden* hearing).

17      Petitioner, however, argues that the evidence of incompetence outweighed the evidence of

18  competence. He picks apart the evidence in favor of the competence determination, casting it in a

19  light most favorable to him. Inversely, he extols the evidence that supported an incompetence

20  finding, buttressing it with additional observations. But none of this shows that the state court was

21  objectively unreasonable. Petitioner is instead asking this Court to re-weigh the evidence.

22  Petitioner failed to persuade the factfinder below—a jury—and is not now entitled to have the

23  Court second-guess that factual determination. § 2254(e)(1).

24      Further, Petitioner's dissection of the state court's analysis does nothing to prove it was

25  objectively unreasonable. For the state court to have "unreasonably applied" or acted "contrary

26  to" Supreme Court precedent, there must *be* Supreme Court precedent on point. There is no

27  clearly-established Constitutional test for sufficiency of the evidence in a competence proceeding.

28  Thus, the state appellate court, with no prevailing constitutional standard to evaluate the

17

1    sufficiency of the evidence, applied the state standard. *Watson*, 2023 WL 5496964, at *9 [ECF

2    No. 11-44] ("'. . . an appellate court must view the record in the light most favorable to the

3    verdict and uphold the verdict if it is supported by substantial evidence. . . . Evidence is

4    substantial if it is reasonable, credible, and of solid value.'") The California Supreme Court

5    reviewed this application of state law and left it undisturbed. (ECF. No. 11-46.) Accordingly,

6    there is nothing left for this Court to do. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not

7    the province of a federal habeas court to reexamine state-court determinations on state-law

8    questions."). Federal habeas relief is not warranted here.

9    **II.    PETITIONER'S CLAIM ABOUT A PINPOINT INSTRUCTION IN HIS COMPETENCY HEARING**

10    **PRESENTS NO FEDERAL QUESTION; BECAUSE THERE IS NO CONTROLLING SUPREME**
    **COURT AUTHORITY, THE STATE COURT'S REJECTION COULD NOT HAVE BEEN**

11    **UNREASONABLE**

12    Before trial on his crimes, Petitioner underwent an evaluation of his competency. The issue

13    was put before a jury, which heard evidence from multiple experts. Petitioner requested that the

14    jury be instructed with specific language on the meaning of "rationally assist," but the trial court

15    declined the request. The jury found Petitioner competent. He complained on appeal that the lack

16    of instruction violated California law and the Due Process clause. The state court was not

17    persuaded.

18    Petitioner repeats his instructional complaint now on federal habeas. (Pet. 22-25.) But he

19    had no constitutional right to a jury's determination on his competence in the first place. Nor did

20    he have a clearly-established constitutional right to a pinpoint instruction on the term at issue.

21    Because there is no federal constitutional right at stake, Petitioner's claim cannot earn him habeas

22    relief. And because there is no controlling Supreme Court authority on point, the state court's

23    rejection of this claim could not have been contrary to, or an unreasonable application of, such

24    absent authority.

25        **A.    The state court's reasoned decision on the competency-instruction claim**

26    In a reasoned opinion, the California Court of Appeal rejected Petitioner's claim that he

27    was entitled to pinpoint instructions during his competency proceedings before the jury. The court

28    wrote:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**II. DID THE TRIAL COURT ERR WHEN IT REFUSED A MODIFYING INSTRUCTIONS ON THE MEANING OF TO "RATIONALLY ASSIST" COUNSEL DURING THE COMPETENCY PROCEEDINGS?**

Watson next contends that the trial court erred in denying his request for a pinpoint instruction during the competency proceedings to clarify that "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. We find no error.

*Background*

The trial court instructed with CALCRIM No. 3451, which, as relevant here, instructed the jury that,

"[Watson] is mentally competent to stand trial if he can do all of the following: Number one, understand the nature and purpose of the criminal proceeding against him; number two, assist, in a rational manner, his attorney in presenting his defense, and; number three, understand his own status and condition in the criminal proceedings. [¶] The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is ... now mentally incompetent because of a mental disorder."

During the competency proceedings, Watson requested the instruction be modified to define the term "rationally assist" as follows:

"Assist his attorney in presenting his defense means that the defendant has the ability to do the following: [¶] 1. Decide whether to remain silent or whether to testify about issues relevant to the charges. [¶] 2. Decide whether to put on a defense. [¶] 3. Decide whether to raise one or more affirmative defenses. [¶] 4. Help his attorney to identify possible witnesses. [¶] 5. Help his attorney to question the government witnesses about issues relevant to the charges. [¶] 6. Decide on overall trial strategy. [¶] If the defendant cannot assist his attorney in a rational manner because of a mental disorder, then you must find him to be incompetent."

The People objected to the proposed instruction as unnecessary. The trial court rejected the proposed instruction "with respect to what it means to assist counsel in presenting a defense" because there "hasn't really been any testimony with respect to the details of what that means, and there wouldn't be any facts to back up any of this—any of the specific areas based upon what the defense has presented at this point." However, the trial court clarified that is would not preclude counsel from arguing "what these various things may be," and would revisit the issue if the jury questioned the phrase. The jury did not submit any questions.

*Applicable Law and Analysis*

As noted above, "The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent." (*Buenrostro, supra*, 6 Cal.5th at p. 385.) The United States Supreme Court established the test for competence to stand trial in *Dusky, supra*, 362 U.S. 402: "it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " In California, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental

19

1    disability, the defendant is unable to understand the nature of the criminal
2    proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

3        CALCRIM No. 3451 is consistent with section 1367, and the California
    Supreme Court has held that even though section 1367 does not match the test
4    articulated in *Dusky* word for word, " ' "[t]o anyone but a hairsplitting semanticist,
    the two tests are identical." ' " (*People v. Dunkle* (2005) 36 Cal.4th 861, 893
5    (*Dunkle*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390,
    421, fn. 22; see also *Buenrostro, supra*, 6 Cal.5th at p. 386.)

6        Watson argues that the trial court should have included an instruction to clarify
7    that the "ability to rationally assist counsel" includes the ability to understand the
    facts of the case and one's basic constitutional rights. The California Supreme Court
8    rejected the contention that CALJIC No. 4.10, which mirrors CALCRIM No. 3451,
    is deficient because it omits the requirements of " 'a rational as well as factual' "
9    understanding of the proceedings, as set forth in *Dusky*. (*Buenrostro, supra*, 6 Cal.5th
    at p. 390.) Like CALCRIM No. 3451, CALJIC No. 4.10 informed the jury that its
10    task was to " 'decide whether the defendant is mentally competent to be tried for a
11    criminal offense' " and explained that " 'a person charged with a criminal offense is
    deemed mentally competent to be tried for the crime charged against [him or her] if,
12    one, [he or she] is capable of understanding the nature and purpose of the proceedings
    against [him or her]; two, [he or she] comprehends [his or her] own status and
13    condition in reference to such proceedings; and, three, [he or she] is able to assist [his
    or her] attorney in conducting [his or her] defense in a rational manner.' "
14    (*Buenrostro, supra*, at p. 385.) The Supreme Court held that the CALJIC No. 4.10
15    instruction was not infirm merely because it did not focus specifically on the
    defendant's " 'rational and factual' " understanding of the proceedings. (*Buenrostro*,
16    at p. 390.) It concluded that " 'one's ability to grasp the nature of the proceedings
    necessarily encompasses one's capacity to have a rational and factual understanding
17    of the proceedings.' " (*Ibid.*)

18        The Supreme Court also rejected a challenge to the CALJIC No. 4.10
    instruction on grounds that it did not explain the various constitutional rights
19    implicated in a criminal trial and failed to tell the jury how much and what kind of
    assistance a defendant must be able to provide counsel. (*Dunkle, supra*, 36 Cal.4th at
20    p. 894.) In particular, the California Supreme Court held that the words "assist" and
21    "rational manner" as used in the CALJIC No. 4.10 instruction were not technical
    terms that required instruction by the trial court. (*Dunkle*, at pp. 894–896.)

22        We conclude, consistent with *Buenrostro* and *Dunkle*, that the CALCRIM No.
23    3451 instruction given here adequately informed the jury of the required findings
    under section 1367. The requisite findings of Watson's ability to "understand the
24    nature and purpose of the criminal proceedings against him," "assist, in a rational
    manner, his attorney in presenting his defense" and "understand his own status and
25    condition in the criminal proceedings" described in CALCRIM No. 3451
26    encompassed Watson's ability to understand the facts of the case against him and his
    basic constitutional rights. The trial court did not err in refusing the requested
27    pinpoint instruction.

28    *Watson*, 2023 WL 5496964, at *11–12 [ECF No. 11-44].

---

20

**B.    The competence-instruction claim presents no federal question and could only have been reasonably rejected by the state court**

The Supreme Court has never articulated a right for a defendant's competency to be decided by a jury; likewise, it has never pronounced the right to pinpoint instructions. Both of those issues remain the province of state law. And, because the Supreme Court has not spoken on the issues, the state court could not have unreasonably applied federal law on those issues. Petitioner's claim fails for each of these independent reasons.

There is no federal constitutional right to a jury trial on the question of competency. *Darrow v. Gunn*, 594 F.2d 767, 774 (9th Cir. 1979); *White Hawk v. Solem*, 693 F.2d 825, 829 (8th Cir. 1982) ("there is no constitutional right to have a jury empanelled for determining competency to stand trial or plead guilty"); *Akhtar v. Knowles*, No. CIV S-03-2674MCEGGHP, 2009 WL 57619, at *8 (E.D. Cal. Jan. 9, 2009) *see United States v. Sahhar*, 917 F.2d 1197, 1207 (9th Cir. 1990). Even in California, the right to have a jury decide one's competence comes from statute, not from the state constitution. *People v. Masterson*, 8 Cal. 4th 965, 969 (1994).  The typical array of a defendant's constitutional rights does not necessarily apply in competency proceedings merely by function of the due process clause. *Medina*, 505 U.S. at 443 (regarding California's statutory competency procedure: "The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order.") Accordingly, the state court could not have unreasonably applied Supreme Court authority in rejecting a constitutional challenge to the omitted pinpoint instruction. *See Huu Thanh Nguyen v. Garcia*, 477 F.3d 716, 727 (9th Cir. 2007) (choice not to apply other areas of federal constitutional rights to competency proceedings not contrary to or unreasonable application of federal law).

Petitioner also has not shown that the pinpoint instruction implicates any constitutional right. The lack of a pinpoint instruction generally does not present a federal question. *McGuire*, 502 U.S. at 72-73 ("the fact that [an] instruction was allegedly incorrect under state law is not a

21

basis for habeas relief."); *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (petitioner's "burden is especially heavy" if no erroneous instruction was given, but rather his claim is the "failure to give" an instruction); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (petitioner may not "transform a state law issue into a federal one merely by asserting a violation of due process," and "alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). Relatedly, there is no Supreme Court authority concerning the right to particular instructions in a competency trial. With no clearly-established Supreme Court authority on the issue, there is nothing for the state court to have unreasonably applied. Thus, Petitioner cannot earn habeas relief for this reason as well. *Lockyer v. Andrade*, 538 U.S. 63, 72–77 (2003); *White v. Woodall*, 572 U.S. 415, 424 (2014).

## III. PETITIONER'S INSTRUCTIONAL CLAIM IS PROCEDURALLY BARRED; ALTERNATIVELY, THE STATE COURT REASONABLY REJECTED THE CLAIM ON THE MERITS

At trial, Petitioner claimed self-defense. The trial court gave standard instructions on self-defense, including the instructions on mutual combat and pretextual self-defense. Petitioner complained about these instructions on appeal, and the state court denied his claims. His claims fail on federal habeas as well. (Pet. at 22-25.)

### A. The state court's reasoned decision on the self-defense instructions claim

In a reasoned opinion, the California Court of Appeal rejected Petitioner's claim that the court should not have given instructions on mutual combat and pretextual self-defense. The court wrote:

> **III. DID THE TRIAL COURT ERR IN INSTRUCTING ON "MUTUAL COMBAT" AND "PRETEXTUAL" SELF-DEFENSE WHEN THERE WAS NO SUBSTANTIAL EVIDENCE TO JUSTIFY THE INSTRUCTION?**
> Watson next argues the trial court erred and violated his constitutional rights during the guilt phase of his trial by instructing the jury with CALCRIM Nos. 3471 and 3472. Watson contends the instructions were not supported by the evidence and that giving the instructions impermissibly deprived him of the ability to rely on self-defense or imperfect self-defense, violating his Sixth and Fourteenth Amendment rights to due process and to present a defense.
> Respondent argues Watson forfeited the claim by failing to object. If not forfeited, respondent contends there was no error, or that any error was harmless. Exercising our discretion to reach the merits, we find no reversible error.
> **<u>Procedural background</u>**
> During a discussion of proposed jury instructions, defense counsel requested

22

instructions on self-defense (CALCRIM No. 505) and voluntary manslaughter/imperfect self-defense (CALCRIM No. 571). The trial court later inquired, "The self-defense, any questions to that one?" Defense counsel questioned if the trial court was "looking at 3471." The trial court replied, "Yes. 3471," and defense counsel stated, "No objection." The trial court then asked, "Same thing with 3472." And again, defense counsel stated, "No objection."

CALCRIM No. 3471, as given, provided:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; and

"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

CALCRIM No. 3472 as given, instructs that "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

### ***Standard of Review***

A trial court must give a requested instruction only if there is substantial evidence to support it, that is, evidence sufficient to deserve jury consideration. (*Marshall, supra*, 15 Cal.4th at p. 39.) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050.) We review the propriety of a trial court's instructions de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) A challenged instruction may not be judged in isolation but must be considered in the context of the instructions as a whole. (Ibid.) " ' 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Ibid.*)

### ***Applicable Law and Analysis***

As a threshold matter, we address respondent's argument that Watson forfeited his contention by failing to object to the instructions below. We conclude that, while Watson did forfeit his claims by failing to object, it is within our discretion to address his claim on the merits to determine whether there was an impairment of his substantial rights. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 916; *People v. Felix* (2008) 160 Cal.App.4th 849, 858.) We do so here.

Turning to the merits, we reject Watson's claim that the trial court erred by instructing the jury with CALCRIM Nos. 3471 and 3472. Watson's argument that

23

1   the instructions were not supported by substantial evidence relies almost exclusively
2   on his own theory of the case while essentially ignoring the reasonable inferences
3   that can be drawn in support of the judgment. When all the evidence is considered,
    and viewed in the light most favorable to the judgment, we conclude there was
    substantial evidence to support the challenged instructions.

4           In particular, the evidence shows that Watson and D.A. were involved in an
5   altercation—with D.A. wanting Watson to drive and Watson wanting her out of his
    vehicle, or even that Watson was the initial aggressor. Watson told police that, at
6   Hales Cottage, D.A. came up to his truck and demanded a ride. When he refused,
    D.A. began kicking his truck and throwing rocks at it. Watson ended up letting her
7   into the truck, but said she was an "evil bitch," and, had she been bigger, he would
8   have punched her. Watson acknowledged that, from the beginning of their
    encounter, he was going to use "brute force" if he had to.

9           When D.A. pulled out a razor blade while in the vehicle, Watson became
10  furious that D.A. was damaging his truck. He said his plan was to grab her hand,
    "jerk her dumb ass out of my truck" and punch her in the mouth before driving away.
11  According to Watson, the two wrestled and Watson was "pushing her harder" and
    the gun went off. While Watson claimed he did not intend to shoot her, he did say
12  he wanted to punch her in the mouth because she cut his seat belt. During Watson's
    statements to law enforcement after the incident, he repeatedly voiced his disdain
13  for D.A., at one point stating "that girl was evil. There was lot of people probably
    wanted to kill that bitch."

14          On this record, there was substantial evidence that Watson was the initial
15  aggressor and/or that he provoked the confrontation with the intent to create an
    excuse to use deadly force. (See, e.g., *People v. Salazar* (2016) 63 Cal.4th 214, 222,
16  249–250; *People v. Enraca* (2012) 53 Cal.4th 735, 761–762; *People v. Bolton*
    (1979) 23 Cal.3d 208, 215; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334.)
    Thus, it was not error to instruct the jury with CALCRIM Nos. 3471 and 3472.

17

18  *Watson*, 2023 WL 5496964, at *12–14 [ECF No. 11-44].

19      **B.    Clearly established principles of instructional error**

20          For a jury instruction error to merit relief, a petitioner must show that the ailing instruction

21  by itself so infected the entire trial that the resulting conviction violates due process. *McGuire*,

22  502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see Donnelly v. DeChristoforo*, 416

23  U.S. 637, 643 (1974) ("it must be established not merely that the instruction is undesirable,

24  erroneous, or even 'universally condemned,' but that it violated some [constitutional] right"). The

25  instruction must not be judged in artificial isolation, but considered in the context of the trial

26  record and the instructions as a whole. *Estelle*, 502 U.S. at 72; *see, e.g., Middleton v. McNeil*, 541

27  U.S. 433, 437–38 (2004) (per curiam) (finding no reasonable likelihood jury was misled by single

28

24

1  incorrect instruction on imperfect self-defense where three other instructions correctly stated the

2  law).

3     Even if an instructional error is found, before granting relief in habeas proceedings the

4  court must find that the error had a substantial and injurious effect or influence in determining the

5  jury's verdict. *Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998).

6     **C.    Petitioner's claim cannot be considered on federal habeas because it was
           forfeited below**

7

8     The state court considered the merits of Petitioner's instructional claim in the alternative

9  after expressly finding it had been forfeited because he did not object to the instructions at trial.

10  *Watson*, 2023 WL 5496964, at *13 ("Watson did forfeit his claims by failing to object . . .") [ECF

11  No. 11-44]. Forfeiture for failure to object is a state procedural bar that is both independent of

12  federal law and consistently applied by California courts. *Fairbank v. Ayers*, 650 F.3d 1243,

13  1256–57 (9th Cir. 2011). The forfeiture bar defaults federal review of a state prisoner's habeas

14  claim. *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977); *Paulino v. Castro*, 371 F.3d 1083, 1092–

15  93 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999); *Bonin v. Calderon*, 59

16  F.3d 815, 842–43 (9th Cir. 1995). Therefore, Petitioner is procedurally barred from raising his

17  instructional claim on federal habeas review.

18     **D.    The state court's rejection of Petitioner's instructional claim was objectively
           reasonable**

19

20     Alternatively, the state court reasonably denied the claim on the merits. Petitioner

21  contended that the mutual combat and pretextual self-defense instructions were incorrect based on

22  Petitioner's interpretation of the evidence in the light most favorable to him.  (Pet. at 25-28.) But

23  as the state court pointed out, Petitioner was "essentially ignoring the reasonable inferences that

24  can be drawn in support of the judgment. When all the evidence is considered, and viewed in the

25  light most favorable to the judgment, we conclude there was substantial evidence to support the

26  challenged instructions." *Watson*, 2023 WL 5496964, at *14 [ECF No. 11-44]. Then the court

27  pointed out the evidence that Petitioner considered the victim an "evil bitch," that from the

28  beginning he was willing to use "brute force" against her, and that he thought a "lot of people

25

1   probably wanted to kill that bitch." *Watson*, 2023 WL 5496964, at *14 [ECF No. 11-44].

2   Additionally, the court summarized a multitude of evidence that Watson used force on the victim

3   because she was damaging his truck, making him the initial aggressor. For example, Petitioner

4   told the police "I was gonna punch her in the fucking mouth is what I was gonna do cause she cut

5   my seat belt . . ." (ECF No. 11-36 at p. 681.) From this and the remaining evidence, a jury could

6   have drawn the inference "that Watson was the initial aggressor and/or that he provoked the

7   confrontation with the intent to create an excuse to use deadly force." *Watson*, 2023 WL

8   5496964, at *14 [ECF No. 11-44].  To support its holding, the state court cited the California

9   Supreme Court's words: "Appellant's own admissions torpedoed his defense." *People v. Bolton*,

10  23 Cal. 3d 208, 215 (1979). In this light, the state court's determination cannot be considered

11  objectively unreasonable. There is no basis for habeas relief.

12  **IV.   PETITIONER'S COMPLAINT ABOUT HIS FIREARM ALLEGATION IS A NON-COGNIZABLE**
13  **STATE-LAW CLAIM**

14         Petitioner used a gun to kill the victim. He was found guilty of second-degree murder and

15  an enhancement for personal use of a firearm. On direct appeal, he argued that the trial judge

16  ought to have considered imposing his firearm enhancement differently. The Court of Appeal

17  rejected his claim. Now on habeas, Petitioner repeats the claim. (Pet. 29-30.) This sentencing

18  question is a matter purely of state law and is not cognizable on federal habeas.

19         **A.     The state court's reasoned decision on the firearm allegation claim**

20         In a reasoned opinion, the California Court of Appeal rejected Petitioner's claim that the

21  trial court misunderstood the scope of its discretion regarding his firearm enhancement. The court

22  wrote:

23             **IV. IS REMAND NECESSARY BECAUSE THE TRIAL COURT DID NOT**
24             **CONSIDER WHETHER TO STRIKE OR MODIFY WATSON'S GUN**
               **ALLEGATION?**

25             Watson next contends that the trial court did not consider whether to strike or
               modify the firearm enhancement (§ 12022.53, subd. (d).) We disagree.
26             ***Background***

27             At sentencing, the trial court sentenced Watson, in part, on count 1 to 15 years
               to life, plus a consecutive 25 years to life for the section 12022.53, subdivision (d)
28             gun allegation. Defense counsel had argued that the imposition of a 25-year-to-life

                                                    26

1
2
3

sentence was tantamount to a life without parole due to Watson's age, which was 55 years. Counsel argued, "If the Court were to stay the 25-to-life special .... The Court has discretion to do that or not." The trial court responded, stating, "Okay. Alright. Based on what I heard at the trial and Mr. Watson's extensive record, I don't see a justification for the dismissal of that particular charge."

4

### ***Applicable Law and Analysis***

5
6
7
8

Watson claims that, at the time he was sentenced in August of 2021, the trial court believed it had discretion only to strike or dismiss that gun enhancement, and was unaware of its discretion to impose a lesser gun enhancement under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), which was decided after Watson's sentencing. The California Supreme Court issued its opinion in *Tirado*, resolving a split of authority among the Courts of Appeal on the question of whether a trial court may strike a section 12022.53, subdivision (d) enhancement and impose a lesser, uncharged section 12022.53 enhancement; *Tirado* applies to all nonfinal judgments.

9
10
11
12
13
14
15

"Section 12022.53 sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies ...: a 10-year prison term for personal use of a firearm, even if the weapon is not operable or loaded (id., subd. (b)); a 20-year term if the defendant 'personally and intentionally discharges a firearm' (id., subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes 'great bodily injury' or 'death, to any person other than an accomplice' (id., subd. (d))." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124.) "For these enhancements to apply, the requisite facts must be alleged in the information or indictment, and [the] defendant must admit those facts or the trier of fact must find them to be true." (*Id.* at pp. 1124–1125.)

16
17
18
19
20
21

Section 12022.53, subdivision (h), as amended effective January 1, 2018, provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 2.) Section 1385 provides: "[A] judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action be dismissed." (§ 1385, subd. (a).) Section 1385 further provides that where "the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice." (§ 1385, subd. (b)(1).)

22
23
24
25
26
27
28

In *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), the court concluded that under then newly amended section 12022.53, subdivision (h), trial courts had the discretion to strike a section 12022.53 enhancement and impose a lesser included, uncharged section 12022.53 enhancement. (*Morrison*, at pp. 222–223.) *Morrison* explained that case law generally supports the imposition by a trial court of a lesser enhancement that was not charged in the information when the greater, charged enhancement was found true by the trier of fact, but the trial court thereafter found that greater enhancement to be either legally inapplicable or unsupported by sufficient evidence. (*Id.* at p. 222.) Based on that general discretion, *Morrison* extended the scope of a trial court's discretion by concluding that a trial court could also impose a lesser section 12022.53 enhancement after striking a section 12022.53, subdivision (d) enhancement under section 1385, even if that lesser

27

enhancement had not been charged in the information and not been found true by a trier of fact. (*Morrison*, at pp. 222–223.)

In this court's opinion in *People v. Tirado* (2019) 38 Cal.App.5th 637 (review granted Nov. 13, 2019, S257658 and reversed and remanded by *Tirado, supra*, 12 Cal.5th 688), this court concluded that the plain language of section 1385 and 12022.53, subdivision (h), did not authorize a trial court to substitute one enhancement for another. (*People v. Tirado, supra*, 38 Cal.App.5th at p. 643.) Accordingly, this court concluded that trial courts do not have the authority to impose lesser, uncharged section 12022.53 enhancements, but rather, have only the binary choice of imposing a section 12022.53, subdivision (d) enhancement or striking or dismissing it. (*People v. Tirado, supra*, 38 Cal.App.5th at pp. 640, 643–644.) In so holding, the court expressed disagreement with the reasoning and holding in *Morrison, supra*, 34 Cal.App.5th 217. (*People v. Tirado, supra*, 38 Cal.App.5th at p. 644.)

In *Tirado, supra*, 12 Cal.5th 688, the California Supreme Court noted the Courts of Appeal split on the question of whether a trial court has the authority to strike a greater section 12022.53, subdivision (d) enhancement and impose a lesser, uncharged section 12022.53 enhancement instead, and agreed with *Morrison*'s holding that trial courts do have such discretion. (*Tirado*, at pp. 696, 701.) In explaining its holding, *Tirado* applied reasoning somewhat different from that applied in *Morrison*, concluding: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[,subdivision] (d) enhancement, and the court determines that the section 12022.53[, subdivision] (d) enhancement should be struck or dismissed under section 12022.53[, subdivision] (h), the court may, under section 12022.5 [, subdivision] (j), impose an enhancement under section 12022.53[, subdivision] (b) or (c)." (*Tirado*, at p. 700.) The court reasoned that section 12022.53, subdivision (h) gives trial courts the discretion to strike or dismiss a greater, charged section 12022.53 enhancement and that section 12022.53, subdivision (j) gives them the discretion to impose a lesser, uncharged section 12022.53 enhancement where the accusatory pleading alleged, and the jury found true, the facts supporting such a lesser, uncharged section 12022.53 enhancement. (*Tirado*, at pp. 694, 697.)

In particular, the court stated: "Section 12022.53[, subdivision] (j) is the subdivision that authorizes the imposition of enhancements under section 12022.53. It provides that for the penalties in section 12022.53 to apply, the existence of any fact required by section 12022.53[, subdivision] (b), (c), or (d) must be alleged in the accusatory pleading and admitted or found true." (*Tirado*, 12 Cal.5th at p. 700.) Accordingly, *Tirado* held that a trial court has the discretion to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged section 12022.53 enhancement where the facts supporting that lesser enhancement were alleged in the information and found true by the jury.

Watson asserts that because the record shows that the trial court was unaware of its discretion to strike the section 12022.53, subdivision (d) enhancement and instead impose lesser, uncharged section 12022.53 enhancements, we must remand the matter to permit the court to decide whether to exercise that discretion.

Respondent argues that, unlike in *Tirado* and *Morrison*, Watson was actually charged with the lesser-included firearm enhancement (§ 12022.53, subds. (b), (c)), along with the more severe enhancement (§ 12022.53, subd. (d)). Respondent argues

that the issue in *Tirado* and *Morrison* was whether a court may strike a firearm enhancement and instead impose a lesser uncharged firearm enhancement. (See *Tirado, supra*, 12 Cal.5th at p. 696 ["The question is whether the court can strike the section 12022.53[, subdivision ](d) enhancement and, in its place, impose a lesser enhancement ... even if the lesser enhancements were not specifically charged in the information or found true by the jury."]; *Morrison, supra*, 34 Cal.App.5th at pp. 224–225 [whether the court has discretion to impose uncharged lesser firearm enhancements "only arises in cases where those enhancements have not been charged in the alternative and found true"].

Here, the verdict forms reflect that the jury found firearm enhancements pursuant to section 12022.53, subdivisions (c) and (d) to be true, [3] and the trial court expressly stayed the lesser enhancement in favor of imposing the greatest enhancement, after explaining its reasoning for doing so. We therefore reject Watson's request for remand on this issue.

[Fn. 3: Although section 12022.53, subdivision (b) was also alleged in the information, it was not included in the verdict forms.]

Because we have addressed this issue on the merits, we need not address Watson's alternate claim that counsel was ineffective for failing to alert the trial court to the "*Tirado/Morrison* issue."

*Watson*, 2023 WL 5496964, at *14–16 [ECF No. 11-44.]

## B.    This is a non-cognizable state law sentencing claim

A federal court may entertain an application for a writ of habeas corpus by a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a). "We have stated many times that federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam) (quoting *McGuire*, 502 U.S. at 67) (internal quotation marks omitted); *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990) (state law errors "are not cognizable in federal habeas proceedings");  *Langford*, 110 F.3d at 1389 (same).

Petitioner asserts that the trial court failed to exercise its discretion by not striking the enhancements. (Pet. 29-31.) The state court reviewed this claim and found it unmeritorious. This Court is bound by the California court's interpretation of California law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). A claim alleging misapplication of state sentencing law is a state-law question that is not cognizable under § 2254. *E.g., Lewis*, 497 U.S. at 780 ("[F]ederal habeas review of a [state's sentencing law] is limited, at most, to determining whether the state court's finding was

so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation"); *Miller v. Vasquez*, 868 F.2d 1116, 1118–19 (9th Cir. 1989). Petitioner does not argue that the trial court's sentencing was arbitrary or capricious. He simply contends that it did not consider sentencing Petitioner "outside of a binary choice [to] 'strike or dismiss'" the enhancement.  (Pet. at 29, emphasis omitted.) Because Petitioner's claim challenges only the application or interpretation of California law, it is not cognizable here. *Sturm v. California Adult Auth.*, 395 F.2d 446, 448 (9th Cir. 1967) ("a state court's interpretation of its [sentencing] statute does not raise a federal question."); *Williams v. Diaz*, No. 118CV01728SKOHC, 2019 WL 399223, at *1 (E.D. Cal. Jan. 31, 2019) (argument that 12022.53 firearm enhancement should have been stricken was noncognizable state-law claim).

## CONCLUSION

Respondent respectfully asks this Court to deny the Petition for Writ of Habeas Corpus.



Dated:  July 12, 2024                              Respectfully submitted,

                                                  ROB BONTA
                                                  Attorney General of California
                                                  TAMI M. KRENZIN
                                                  Supervising Deputy Attorney General



                                                  /s/ ***Charity S. Whitney***
                                                  CHARITY S. WHITNEY
                                                  Deputy Attorney General
                                                  *Attorneys for Respondent*

SA2024302292
Watson Answer (final).docx

## <u>DECLARATION OF SERVICE BY U.S. MAIL</u>

Case Name:   **Watson v. Smith**

No.:   **1:24-cv-00567-SKO**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550.

On <u>July 12, 2024</u>, I served the attached **Answer to Petition for Writ of Habeas Corpus** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Sacramento, California, addressed as follows:

Dale William Watson
BP-8474
Pleasant Valley State Prison (8500)
P.O. Box 8500
Coalinga, Ca 93210

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 12, 2024, at Sacramento, California.

| M. Sanchez | /s/ *M. Sanchez* |
|:---:|:---:|
| Declarant | Signature |