1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DALE WILLIAM WATSON,                    No.  1:24-cv-00567-KES-SKO (HC)

12                      Petitioner,          **FINDINGS AND RECOMMENDATION
                                             TO DENY PETITION FOR WRIT OF
13          v.                               HABEAS CORPUS**

14   STEPHEN SMITH,                          **[THIRTY-DAY OBJECTION DEADLINE]**

15                      Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned pursuant to 28 U.S.C.

19   § 636(b)(1)(B) and Local Rule 302.  As discussed below, the Court finds the petition to be

20   without merit and recommends it be **DENIED.**

21   **I.      PROCEDURAL HISTORY**

22          On April 2, 2021, a Tulare County jury found Petitioner guilty of one count of second

23   degree murder (Cal. Penal Code § 187(A), one count of being a felon in possession of a firearm

24   (Cal. Penal Code 29800(a)(1), and one count of unlawful possession of ammunition (Cal. Penal

25   Code § 30305(a)(1)). (Doc. 11-36 at 297.[1])  The jury found true allegations that Petitioner

26   personally and intentionally discharged a firearm causing great bodily injury or death (Cal. Penal

27

28   _____
     [1] Citations are to ECF pagination.

1   Code § 12022.53(d)), and personally and intentionally discharged a firearm during the

2   commission of the murder (Cal. Penal Code § 12022.53(c)). (Doc. 11-37 at 2.)  On August 31,

3   2021, Petitioner was sentenced to an indeterminate term of 40 years to life plus a determinate

4   term of 3 years.  (Doc. 11-37 at 2; 11-36 at 297.)

5           Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

6   DCA"). (Doc. 11-43.) On August 25, 2023, the Fifth DCA affirmed the judgment. <u>People v.</u>

7   <u>Watson</u>, 2023 WL 5496964 (Cal. Ct. App. 2023). Petitioner then petitioned for review in the

8   California Supreme Court. (Doc. 11-47.)  On November 16, 2023, the California Supreme Court

9   summarily denied review. (Doc. 11-48.)

10          On May 13, 2024, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc.

11   1.)  Respondent filed an answer on July 12, 2024. (Doc. 12.)  Petitioner did not file a traverse.

12   **II.      FACTUAL BACKGROUND[2]**

13          In March of 2019, Jacqueline R. was living and working at Hales Cottage Motel in

14   downtown Tulare on K Street. The motel was known to police for drug sales and prostitution.

15          Jacqueline R.'s "son's cousin," D.A., visited Hales Cottage occasionally, and she was

16   there on the night of March 2, 2019, helping Jacqueline R. paint a room Jacqueline was moving

17   into. D.A. left and went to another motel room, where Joshua L. lived. Joshua L. had known D.A.

18   since she was a baby. D.A. spent the night in Joshua L.'s room, sleeping on a chair.

19          Joshua L. recalled D.A. "acting out" and being "irate" the next morning, March 3.

20   Jacqueline R. and Joshua L. tried to calm D.A. down, but she was telling people to leave her

21   alone. When D.A. did calm down, Joshua L. returned to his room, and D.A. stayed with

22   Jacqueline R.

23          Later that morning, Jacqueline R. noticed a truck pull into the motel area, leave, and then

24   return. The driver, whom Jacqueline R. identified as Watson, asked her if she was a prostitute.

25   Jacqueline R., who had never seen Watson before, asked him why he was there. Watson said he

26

---

27   [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§
    2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in <u>Watson</u>,
28   2023 WL 5496964, at *1-5.  <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

2

was looking for a "girl" or "friend." When Jacqueline R. asked for her name, Watson would not say.

The motel manager came out and spoke to Jacqueline R., Watson, and D.A., who was also there. D.A. jumped into Watson's truck, although Jacqueline R. told Watson not to let her do so. D.A. and Watson drove away. Jacqueline R. testified that D.A. was not being violent at the time, and denied telling Detective Van Curen that D.A. was acting like she was high on methamphetamine.

At around 8:00 or 8:30 a.m. on March 3, Christopher G. was driving northbound on Freeway 99 when his truck broke down, near Elk Bayou Park. As he was working on his truck at the side of the road, he heard a pickup drive by, but paid no attention to it. About five or six minutes later, he heard a gunshot or two—he thought the second sound might have been the recoil. Christopher G. then saw a truck, brown in the front and yellow in the back with a brown toolbox, later identified as Watson's truck, leave the area after the shooting.

Watson's girlfriend, April O., had known Watson for 35 years and dated him for 11 years. In March 2019, April O. was living with her father, but regularly stayed at Watson's mobile home off Highway 190 in Poplar, south of Tulare. Watson drove a dark brown and beige GMC pickup truck. On the night of Friday, March 1, April O. spent the night with Watson and he dropped her off at her father's house around noon the following day, and she did not see him again until Sunday (March 3) in the late afternoon, early evening. Watson had called April O. at around 11:00 a.m. that day and said he was going to get a weed eater to clean up the property where he lived.

April O. saw Watson again on Monday, March 4, at work when she took him to lunch. Watson's mustache had been shaved off, but April O. claimed he did that periodically. Watson made no mention of getting into a fight.

When April O. saw Watson on Tuesday, March 5, his truck had been painted with primer. April O. had seen Watson with a pistol in 2017, and she had previously seen him at a hotel in Tulare without her at the beginning of their relationship. April O. did not recall telling a police officer that she found an "adult finder" on Watson's phone. April O. acknowledged that Watson

3

used methamphetamine off and on during their relationship. She was not certain, but thought that, in March of 2019, he was using every day. When Watson came down from the drug, he would act like a child and throw a tantrum, be mad, and slammed things around. She admitted Watson would sometimes get violent when he was coming down from methamphetamine, but she never saw him be violent towards anyone.

*Police Investigation*

At about 5:23 p.m. on March 3, 2019, Police Officer Jose Valencia was dispatched to the area of Elk Bayou Park located just off Highway 99, south of Hales Cottage Motel, regarding a possible gunshot victim. When he arrived, he saw a body on the ground, and he made contact with Eric F., who had been riding his dirt bike when he discovered the body and called police. Officer Valencia spoke to Eric F., who reported he found the victim with no one around. The victim, later identified as D.A., had suffered a gunshot wound to the torso and was found lying on a dirt access road.

Officer Cynthia Vasquez arrived shortly thereafter and searched the scene. No shell casings were found and there were no percipient witnesses present. A notepad, methamphetamine pipe, a lighter, a lottery ticket, and the blade of a utility knife were found two to three inches from D.A. D.A. had bruising and marks on her neck and left hand and injury to her fingers. Fresh tennis shoe and oversized tire tracks were found in the mud area near the body.

Chief Deputy Coroner Alan Knight examined D.A.'s body at the scene and found no signs of strangulation. Knight opined D.A. had died within eight to 12 hours prior to his inspection.

Dr. Garry Walter conducted an autopsy of D.A. and concluded she died of a single perforating gunshot wound to the chest with entry and exit wounds. She had a third wound on the left hand.

Dr. Othon Mena reviewed Dr. Walter's report, the toxicology report, multiple police reports, and photographs of the autopsy and death scene, and opined D.A.'s shooter had been a few inches to more than a few feet away when the gun was fired. He opined D.A. died within minutes of being shot, and the bone fracture on her left hand could also have been the result of a gunshot wound. Dr. Mena opined the bullet to be in the .30- to .40-caliber range. He saw no signs

4

1  of the bullet hitting something before it struck the body.

2       Retrieved surveillance videos showed Watson's truck at about 8:20 a.m. on March 3,

3  going southbound just west of Highway 99, towards where D.A.'s body was found. Video

4  footage from a mobile home that faced Elk Bayou Park showed Watson's truck driving slowly in

5  the early morning hours. And a surveillance video from Hales Cottage at 8:14 a.m. on March 3,

6  shows Jacqueline R., D.A., Watson, and the owner of the motel. D.A. is also seen talking to an

7  unknown man who was staying at the motel and then getting into Watson's truck.

8       Police spoke with Fausto Hernandez, the owner of G&M Auto where Watson worked.

9  While there, Sergeant Kenneth Jones found a can of primer and a new jacket that was later

10  identified as belonging to Watson. Hernandez told Sergeant Jones that he helped Watson paint his

11  brown or gold C10 truck to a flat green color, because Watson told him he got into "a little

12  trouble with some guy" and wanted to paint it. Watson also borrowed a weed eater to clean up his

13  yard. Watson rented trailer space in front of Hernandez's house in Poplar.

14  *Watson's Post-Arrest Statements*

15       Watson was taken into custody on March 5, and interviewed twice by police. Both

16  interviews were played for the jury.

17       During the first interview, Watson was read his <u>Miranda</u>[3] rights and stated that he had

18  been using methamphetamine at a truck stop between Tulare and Tipton on Saturday evening,

19  (March 2, 2019), and decided to drive to Hales Cottage to buy more. While there, Watson ran into

20  a big "black lady" who sold him some drugs and asked him to help her move some "stuff," when

21  D.A. came up "raising hell." Watson helped the woman move her furniture, but D.A. was

22  adamant about being given a ride to the store and jumped into his truck. The woman told D.A. to

23  get out of the truck and leave, but she refused.

24       Watson stated he did not want any problems and decided to take D.A. to Love's Truck

25  Stop and get rid of her. But when they got there, D.A., who had been smoking methamphetamine

26  in the truck, refused to get out. D.A. said she needed to make some money and threatened to take

27

28  [3] <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-479 (1966).

1 | Watson's truck while holding a razor blade.

2 |      When Watson saw a car pull up that he had seen earlier at the motel, he took off with D.A.
3 | still in the truck. Watson took D.A. to a park and tried to get her out of the truck. D.A. cut the
4 | truck's seat and seat belt while he physically removed her from the truck, stating he "feared for
5 | [his] life." After he removed D.A. from the truck, Watson took off. While backing up, he thought
6 | he ran over her because he was "driving as fast as [he] fucking [could]."

7 |      Watson denied having a gun or shooting D.A., and, if he had, "[I]t would have been self-
8 | defense," as she had a razor blade and was trying to hurt him. Watson described seeing D.A.
9 | fighting with the "big lady" at the motel, and kicking at the passenger door and slamming the
10 | driver's door of his truck. He also recounted that D.A. threatened to take his truck or have her
11 | "man" take it. Watson said "that girl was evil. There was lot of people probably wanted to kill
12 | that bitch."

13 |      Watson acknowledged being a felon, but reiterated that, even if he shot D.A., it would be
14 | self-defense because she tried to hurt him with a razor blade. Watson claimed to be surprised
15 | when he learned D.A. had died, and was adamant that, when he left her, she was yelling at him
16 | and he did not shoot her. Watson alleged that he primered his truck because it needed to be
17 | repainted.

18 |      Watson was interviewed a second time the following day. Watson related the same
19 | account of giving D.A. a ride and her then refusing to get out of his truck, and that she pulled a
20 | razor blade and threatened to take his truck. Watson said he left Love's with D.A. when he saw
21 | the same vehicle at Love's that he had seen at Hales Cottage and thought it was D.A.'s pimp or
22 | boyfriend trying to steal his truck. While they were driving, D.A. grabbed a fork from the dash
23 | and began damaging the dash of his car with the razor and the fork. He stopped on a dirt road next
24 | to the park and yelled at D.A. to get out, but D.A. refused to get out.

25 |      Watson got out of the driver's side and tried to open the passenger door. D.A. had locked
26 | the door, so Watson ran back to the driver's side, which was still open, to retrieve his keys. On his
27 | way, he grabbed a gun he had hidden under his toolbox. Inside the truck, Watson held the gun and
28 | told D.A. to get out. D.A. lunged at him. Watson grabbed D.A.'s hand and reached over to the

1   passenger door to open it and push her out, but D.A. tried to hit or cut him. Although D.A.

2   continued to resist and fight, Watson managed to push her out of the truck when she lunged at

3   him again and the gun went off accidently. Watson thought the first shot hit the truck door

4   because, after he pushed her out, D.A. was standing outside the passenger door laughing and

5   cutting his seat belt with the razor blade.

6        D.A. yelled at Watson and threatened that he was "a dead motherfucker." Watson pulled

7   the trigger the second time to scare her, as he saw "some fucking psycho bitch trying to kill me

8   and take my truck." Watson had no idea D.A. had died until police told him, and did not think he

9   had hit her. Watson admitted there was a couple of seconds between shots, but he did not point

10   the gun at her, only towards her. Watson explained that, after the first shot, his truck would not

11   start and when D.A. started coming after him, he thought she would kill him. Watson pulled the

12   trigger the second time because D.A. was trying to kill him and he wanted to "scare the bitch."

13        Watson explained that he initially lied to police about the shooting because he was scared.

14   He believed he acted in self-defense because D.A. was threatening him with a weapon. Watson

15   denied painting his truck or shaving his mustache to hide from police. He did not think of calling

16   police because he is a felon with a gun. Watson did not see D.A. lying on the ground. Watson

17   sold his gun, but would not say who he sold it to, stating, "The gun's gone."

18   *Forensic Evidence*

19        When Watson was taken into custody, he had abrasions or scratch marks on the top of his

20   left hand. No expended casings or ammunition were found where D.A.'s body was discovered. A

21   criminalist specializing in tire impressions opined that the tires on Watson's truck had the same

22   tire design and size as the tire impressions taken from the crime scene.

23        D.A.'s DNA was found on the razor blade discovered at the scene and tested presumptive

24   positive for blood. Watson's DNA was not found on the razor. D.A.'s DNA was eliminated from

25   the sperm and non-sperm factions from penile samples taken from Watson's sexual assault kit.

26   There was no semen found on the samples taken from D.A.'s assault exam. Watson's DNA was

27   found on a pair of jeans found in his truck, which tested presumptive positive for blood.

28        Three particles, one characteristic of gunshot residue (GSR) and two consistent with GSR

1   were found on the back of Watson's jacket. No GSR samples were taken from the inside of

2   Watson's truck and no analysis of a GSR residue stub obtained from inside the truck was tested.

3   *Defense Case*

4       Kenton Wong, a senior forensic scientist at the Forensic Analytical Crime Lab in San

5   Francisco, testified as an expert for the defense. He reviewed Department of Justice reports

6   regarding GSR in this case, but found nothing "remarkable." Wong also reviewed the report that

7   mentioned collection of GSR from Watson's jacket and found it was not consistent with what

8   would typically be found when a gun is fired, which would show a "plume" of thousands of

9   residue particles. Instead, he found the particles more consistent with contamination from GSR.

10       Wong opined that the toxicology report for D.A. showed that, at the time of her death, the

11   amount of methamphetamine in her system was "indicative of someone who was intoxicated and

12   under the influence." An individual with that level of the drug would experience "extreme

13   anxiety, maybe paranoia, [and] confusion," and could act aggressively and violently.

14       Psychologist Doriann Hughes conducted an evaluation of Watson on September 20, 2019,

15   and diagnosed him with bipolar disorder, which is characterized by cycling episodes of manic

16   behavior and depressive symptoms. When she evaluated Watson, he was displaying symptoms of

17   mania, meaning his mood was elevated and his thoughts racing, irrational, and paranoid. Dr.

18   Hughes opined that people with bipolar disorder do not process information in time to react to a

19   situation like a perceived threat, but instead their body is already preparing to respond to the

20   threat before thinking it through. Dr. Hughes explained that, for someone who is bipolar, the

21   stressful event is viewed through the lens of psychosis or paranoia so that decision making is

22   short-circuited.

23       Mariana Hernandez testified that she worked at the Quick Trip in March of 2019, where

24   D.A. was a frequent customer, often with Raul, who also went by Salvador or Chaba. The day

25   before D.A. died, Hernandez overheard Raul threatening to kill her. Raul was under the influence

26   and talking nonsense, a regular occurrence.

27       Maby Gomez also worked at the Quick Trip and knew D.A. and Raul, who was described

28   as D.A.'s boyfriend, as frequent customers. On March 2, 2019, Gomez overheard Raul call D.A. a

1   "fucking black woman" who did not know what he was capable of doing.

2        Defense investigator Wayne Autry spoke with witness Christopher G. about his car

3   breaking down on the side of the road. Although Christopher G. had testified that his Ford F-150

4   broke down, he told Autry it was a semi-tractor truck. Christopher G. also told Autry he heard

5   only one gunshot.

6   **III.    DISCUSSION**

7        A.    Jurisdiction

8        Relief by way of a petition for writ of habeas corpus extends to a person in custody

9   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

10  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

11  529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

12  guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare

13  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

14  2254(a); 28 U.S.C.§ 2241(d).

15       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

16  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

17  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

18  filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

19  and is therefore governed by its provisions.

20       B.    Legal Standard of Review

21       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

22  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

23  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

24  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

25  based on an unreasonable determination of the facts in light of the evidence presented in the State

26  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

27  Williams, 529 U.S. at 412-413.

28       Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

9

federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).  This court looks to "Supreme Court holdings at the time of the state court's last reasoned decision" as "the source of clearly established Federal law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S. 120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied federal law to a claim of prejudice under Strickland where the logic of petitioner's argument would have required the extension of the Supreme Court's inherent prejudice doctrine to a new context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991 (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state court decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 592 U.S. 111, 118 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (*per curiam*)).  Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118.  In other words, so long as fairminded jurists could disagree with each other as to whether the state court was correct, the state court decision is not unreasonable under AEDPA.  Congress "meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

Section 2254(d)(2) pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  The federal habeas court must give "substantial deference" to the state court.  Brumfield v. Cain, 576 U.S. 305, 314 (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the burden of overcoming the presumption with "clear and convincing evidence to the contrary."  Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's factual determination was unreasonable.  Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019) (en banc).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error

had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007) (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     <u>Review of Petition</u>

Petitioner presents four grounds for relief in his petition: 1) There was insufficient evidence of his competency to stand trial; 2) His due process rights were denied when the trial court refused a defense request for pinpoint instruction on the meaning of "rationally assist" during his competency proceeding; 3) The trial court erred by instructing on mutual combat and pretextual self-defense; and 4) The trial court failed to consider whether to modify or strike the gun allegation.

1.     <u>Claim One</u>

In his first claim, Petitioner alleges he was incompetent to stand trial. At trial, the jury determined that he was competent.  He claims there was insufficient evidence of his competency in violation of his due process rights.  Petitioner raised this claim on direct appeal.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Watson contends there is insufficient evidence to sustain the jury's determination of competency, thus the jury's findings and the judgment of conviction must be reversed. We disagree.
>
> *Pretrial Proceedings*
>
> As stated above, on September 6, 2019, over Watson's objection, defense declared a doubt as to Watson's competence and criminal proceedings were suspended. (§ 1368.) That same date, Drs. Dorian Hughes and Brandi Mathews were appointed, pursuant to sections 1367 and 1368, to examine Watson. They submitted conflicting reports regarding Watson's competency. On October 4, 2019, Watson was re-referred to Dr. Mathews for a supplemental report.
>
> On November 8, 2019, the trial court granted a defense motion for a competency trial with the preliminary issue of Watson's competence to stand trial to be tried by a jury. Specifically, the issue was whether Watson could rationally assist his counsel in his defense.
>
> A competency trial, with jury, was held January 2-3, 2020, finding Watson competent to stand trial.

12

*Testimony at the Competency Trial*

### 1. Testimony of Doriann Hughes

Dr. Hughes, a consultant psychologist for the Department of State Hospitals, testified that she was assigned to evaluate Watson and whether he could "understand the charges against [him], understand the proceedings against [him], and can work with [his] attorney in a rational capacity ...." Dr. Hughes conducted the 90-minute long evaluation on Watson on September 20, 2019, at which point she determined he was incompetent to stand trial.

Dr. Hughes testified that Watson's interview lasted a bit longer than normal because of the "difficulty in conducting the interview," stating it took a "really long time to get information from him and keep him focused on the questions." As part of the evaluation, Dr. Hughes conducted the "FIT-R" an instrument to evaluate competency to stand trial. The FIT-R looks at an individual's knowledge of the legal system, their understanding of consequences, and ability to communicate with counsel. Dr. Hughes opined that Watson's "most concerning area," was his ability to communicate with counsel, as he expressed "really irrational thinking."

Dr. Hughes also conducted a mental status examination and behavioral observation. Dr. Hughes testified that areas of concern were his ability to communicate, which jumped from topic to topic, and he was "quite expansive in his mood, so some mood instability." Dr. Hughes observed Watson to be "very animated and euphoric" throughout the interview, and she ascribed a diagnosis of bipolar disorder. Watson had reported a history of some mental health treatment, a history of depression, suicide, elation, and at one point had been reported having been diagnosed as bipolar.

Dr. Hughes did not conduct a malingering assessment of Watson because she did not think that was happening. Watson presented no indicators that lead her to believe that he was malingering.

Dr. Hughes testified that individuals with bipolar disorder benefit from medication, often within four to six weeks. Dr. Hughes did not find Watson competent to stand trial because, at the time she met with him, he was not taking medication, and was exhibiting symptoms that would impact his ability to work with his counsel in a coherent manner. Dr. Hughes recommended that Watson receive treatment competency training, which involved, in his case, primarily medication. Dr. Hughes again opined that Watson had difficulty communicating and also had a "significant distrust for his defense team."

On cross-examination, Dr. Hughes testified that Watson "did well" on the first prong of the FIT-R, as he understood the court process—what he was charged with, what everyone's roll in the courtroom was, on the consequences he was facing. Watson discussed possible defenses to his case and offered different

scenarios as to what he thought could have happened.

Dr. Hughes was concerned with Watson's distrust of and "irrational beliefs" about his attorney. Dr. Hughes acknowledged that someone could be diagnosed with bipolar disorder, depression, or be suicidal and still be competent to stand trial. She also acknowledged that Watson showed no signs of talking to someone who was not there or having hallucinations, and he was cognizant of his surroundings.

When asked if Watson had mentioned that he "tried to fire his attorney," Dr. Hughes testified that Watson had said he tried to fire him or wanted to fire him, but Dr. Hughes did not recall if Watson had actually gone through the process. Dr. Hughes knew such a procedure was known as a *Marsden* hearing. Following a sidebar, the People requested that the trial court take judicial notice and the court informed the jury of the fact that Watson had brought two *Marsden* hearings—one on September 6, 2019, and one on June 26, 2019—and both were denied. After the statement to the jury, Watson offered that there had been three *Marden* hearings, not two.

Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Watson had also told her he was upset at his attorney because the attorney had not checked into his alibi. Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said understood that it was important to discuss that with his attorney. He also understood that it was important for him to use proper decorum in the courtroom.

Dr. Hughes also could not rule out a diagnosis of a neurocognitive disorder based on a previous head trauma. Dr. Hughes acknowledged that Watson's methamphetamine use could affect his mental health issues.

### 2. Testimony of Brandi Matthews

Brandi Matthews, a licensed psychologist with the State of California as well as in private practice, was hired in her private capacity to evaluate Watson twice. Dr. Matthews's opinion after her second evaluation of Watson was that he was not able to assist counsel in a rational manner. According to Dr. Matthews, Watson appeared to understand her questions and provide relevant responses the first time she evaluated him. She described him as "goal directed," "calm and cooperative." The second time, when he began discussing various aspects of his case, he became very "loud," "very agitated," and exhibited "mood liability"—a rapid shift or change in mood. During the second interview, Dr. Matthews also noticed statements with underlying theme of paranoia related to the case, claiming a conspiracy against him and his family in Tulare County. Specifically, Watson thought the sheriff investigator on the case was leading a drug business at a hotel. And he believed there were pages missing in the police report that would be helpful to him.

14

Dr. Matthews stated that she did not administer any standardized evaluations of Watson during either interview. Dr. Matthews arrived at "diagnostic impressions," but not a "specific diagnosis." Dr. Matthews opined that Watson appeared to exhibit mood symptoms consistent with bipolar disorder, and had a "level of loss of touch with reality." He had difficulty remaining on topic during the 45-minute session.

Dr. Matthews acknowledged that Watson understood the charges against him and the consequences of being found guilty, he understood roles of courtroom personnel, and understood legal options. However, Dr. Matthews opined that Watson was not competent to stand trial because he was not able to assist counsel in a rational manner due to his psychiatric symptoms. Dr. Matthews cited Watson's belief that defense counsel was part of a conspiracy, and that he was innocent and did not think anyone was "working with him."

Dr. Matthews testified that the primary treatment for bipolar disorder would be psychotropic medication. Dr. Matthews also discussed competency restoration programs, which could be administered in a state hospital or jail.

On cross-examination, Dr. Matthews was first asked about her first evaluation of Watson, which took place on September 13, 2019. At that point, Watson was "linear in thought." During that interview, Watson understood plea bargaining, the difference between a jury and court trial, and appropriate courtroom behavior. Dr. Matthews opined that, at that point, Watson was able to assist his attorney in conducting his defense. While she noted that Watson would continue to pose a challenge for his attorney, there was no evidence the difficulties were linked to psychotic symptoms.

After the first interview, Dr. Matthews received additional information about Watson from defense attorney and received multiple interviews with defense attorney's social worker. During the second interview on November 1, 2019, Watson spoke more about the facts of his case and the fact that he believed his attorney was not looking into possible defenses. Dr. Matthews did not see any signs of malingering on Watson's part.

In Dr. Matthew's second interview, Watson talked about the fact that he was being slandered on the sheriff's department Web site. Dr. Matthews acknowledged that it was not uncommon for a criminal defendant to fear or feel unnerved when in custody with the status of their case.

### 3. Testimony of Joshua Nelson

Joshua Nelson, a correctional deputy at the Bob Wiley Detention Facility, testified that he had weekly contact with Watson within the past year while he was an inmate there. Nelson never talked to Watson about his criminal case, nor had he heard Watson discuss it with other inmates. Nelson had not heard Watson scream or yell for no reason, and he had never been disrespectful towards Nelson.

### 4. Testimony of Aaron Panttaja

Aaron Panttaja, a correctional deputy at Bob Wiley Detention Facility, testified that he saw Watson on a daily basis for the past three months and had never seen him act out towards him or other staff or have outburst or yell. Panttaja observed Watson having what seemed like casual conversations with other inmates, and he had never heard him talk about his case to other inmates. Neither had he heard Watson talk about his attorney to any other inmate and he had received no complaints from other inmates about Watson's behavior.

### 5. Testimony of Miguel Franco

Miguel Franco, a detective with the Tulare County Sheriff's Office, testified that he had contact with Watson in March of 2019 and obtained a small bindle of methamphetamine from his person. Franco told Watson he was going to destroy it and he would not be charged with it. Franco testified that the sheriff's department put "vague information" on social media about Watson in an effort to get the public's assistance on further details of the crime.

### Applicable Law and Standard of Review

"As a matter of due process, '[a] defendant may not be put to trial unless he "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.'"' (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354, quoting *Dusky v. United States* (1960) 362 U.S. 402) (*Dusky*).)." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 386 (*Buenrostro*).) "A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).)" (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*).)

"The law presumes a person is competent to stand trial. ( ... § 1369, subd. (f).) 'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' (*People v. Mendoza* (2016) 62 Cal.4th 856, 871 [(*Mendoza*)]; see ... § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 446 ... [allocation of the burden of proof to a criminal defendant to prove incompetence does not violate procedural due process].)" (*Buenrostro, supra*, 6 Cal.5th at p. 387.)

Watson contends there is insufficient evidence to support the jury's verdict finding him competent to stand trial. Citing *People v. Samuel* (1981) 29 Cal.3d 489, Watson argues that a judgment of conviction must be reversed when there is "persuasive and virtually uncontradicted" evidence of a defendant's mental incompetence (*id*. at p. 506). We agree with that statement. He then asserts that the evidence in this case, which he contends was unanimous expert testimony contradicted only by lay testimony, is "persuasive and virtually uncontradicted"

16

evidence of his mental incompetency. We disagree.

We apply "a deferential substantial evidence standard of review." (*Mendoza, supra*, 62 Cal.4th at p. 871.) When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial. (*Id*. at pp. 871-872, citing *People v. Marks* (2003) 31 Cal.4th 197, 219. fn. 3.) "In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence. [Citation.] Evidence is substantial if it is reasonable, credible, and of solid value." (*Marshall, supra*, 15 Cal.4th at p. 31.)

"Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Zamudio*, at p. 357.)

Here, substantial evidence supports the jury's verdict finding Watson competent to stand trial. The jury did not have to accept the opinion of experts. As our Supreme Court has observed: "'Of course, the jury is not required to accept at face value a unanimity of expert opinion: "To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by jury...."'" (*Marshall, supra*, 15 Cal.4th at p. 31.)

The value of an expert's opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the conclusion. (*Slaten v. State Bar* (1988) 46 Cal.3d 48, 55; *People v. Samuel, supra*, 29 Cal.3d at p. 498.) Here, both of Watson's expert witnesses, Dr. Hughes and Dr. Matthew, based their opinions regarding Watson's competence to stand trial primarily on their interviews with Watson. Dr. Matthews's opinion changed from finding Watson competent after the first interview to incompetent after the second interview, which took place after she had a conversation with defense attorney and she reviewed multiple interviews with Watson's attorney's social worker.

Both experts agreed that Watson was able to understand the nature of the proceedings against him—the charges he was faced with and the role of the attorneys, judge, witnesses, and jurors. The argument on appeal is that the jury received evidence from which it should have found Watson incompetent as he was unable to assist his counsel in the conduct of a defense in a rational manner. However, there was also evidence of Watson's ability to work with counsel at trial—if he wanted to—to support the jury's verdict of competency. While Watson expressed anger and frustration with his attorney for not doing what he wanted him to do, he did not exhibit irrational thinking or inability to assist in his defense. Watson had, by his own calculations, attempted three times to dismiss his attorney.

The two deputy correctional officers at the detention facility where Watson was housed testified to no abnormal behavior on Watson's part in that setting. Both had continued contact with Watson.

In *People v. Samuel, supra*, 29 Cal.3d 489, our Supreme Court reversed for insufficiency of evidence a jury's verdict finding the defendant in that case competent to stand trial. But *Samuel* is factually distinguishable from this case. In *Samuel*, five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified that the defendant was incompetent to stand trial. This testimony was supported by four psychiatric reports, and the prosecution's witnesses did not contradict any of the defense testimony. (*Id*. at pp. 497–498.)

Here, in contrast, only two defense experts testified regarding Watson's incompetence to stand trial. As set forth above, their opinions were somewhat tenuous. Both experts opined that Watson was not able to adequately communicate with his defense counsel and therefore unable to assist counsel in his defense. Watson had complained to both experts that counsel was not listening to him and did not follow through on his suggestions for his defense. Dr. Hughes testified that Watson told her he was upset at his attorney because the attorney had not checked into his alibi. However, Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said he understood that it was important to discuss that with his attorney. He also understood that it was important for him to use proper decorum in the courtroom. Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Dr. Hughes agreed that it was "difficult" at times how to distinguish between someone who is choosing not to work with their attorney and someone who has a mental disorder affecting their inability to do so.

In support of her opinion that Watson could not assist in his defense, Dr. Matthews cited the fact that Watson believed defense counsel was part of a conspiracy, as was the sheriff's department, and that Watson believed he was innocent and did not think anyone was "working with him."

Watson's dispute with his attorney over how to handle his case does not invalidate his competency to stand trial. In *People v. Hightower* (1996) 41 Cal.App.4th 1108, the court rejected a defendant's contention that "his disruptive behavior in the courtroom and disputes with defense counsel prove that he was not competent to stand trial." (*Id*. at p. 1112.) The court in *Hightower* reasoned, "His conduct demonstrates an unwillingness to cooperate with defense counsel but does not constitute proof of mental incompetence. '[T]he test, in a section 1368 proceeding, *is competency to cooperate, not cooperation*.'" (*Hightower*, at p. 1112, italics added; accord, *People v. Clark* (2011) 52 Cal.4th 856, 893.)

We conclude the evidence presented to the jury was sufficient to support the jury's verdict that Watson was competent to stand trial.

18

1   <u>Watson</u>, 2023 WL 5496964, at *6-11.

2                    a.      <u>Legal Standard</u>

3          A defendant has a constitutional right "not to be tried while legally incompetent," and a

4   State's "failure to observe procedures adequate to protect a defendant's right not to be tried or

5   convicted while incompetent to stand trial deprives him of his due process right to a fair trial."

6   <u>Drope v. Missouri</u>, 420 U.S. 162, 172-173 (1975).  To be deemed competent to stand trial, a

7   defendant must have "sufficient present ability to consult with his lawyer with a reasonable

8   degree of rational understanding" and possess "a rational as well as factual understanding of the

9   proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402 (1960) (per curiam).

10          A State's presumption that defendant is competent to stand trial does not offend due

11   process, nor does placing the burden of proof on the defendant to show incompetence.  <u>Medina v.</u>

12   <u>California</u>, 505 U.S. 437, 452-53 (1992).  Further, due process "does not . . . require a State to

13   adopt one procedure over another."  <u>Id</u>. at 451.  "[I]t is enough that the State affords the criminal

14   defendant on whose behalf a plea of incompetence is asserted a reasonable opportunity to

15   demonstrate that he is not competent to stand trial."  <u>Id</u>. at 451.

16                    b.      <u>Analysis</u>

17          As there is no Supreme Court authority directly addressing the sufficiency of evidence

18   required to find a defendant incompetent, Petitioner cannot show the state court acted contrary to,

19   or unreasonably applied, such precedent.  The state court also relied on California law in finding

20   Petitioner had failed to overcome the presumption of competence.  Where there is no federal law

21   on point governing an issue and the state court relies on state law in its determination, a reviewing

22   federal habeas court may not disturb the state court's ruling. <u>Knowles v. Mirzayance</u>, 556 U.S.

23   111, 122 (2009) (citing <u>Wright v. Van Patten</u>, 552 U.S. 120, 123 (2008) (per curiam)) ("[I]t is not

24   'an unreasonable application of' 'clearly established Federal law' for a state court to decline to

25   apply a specific legal rule that has not been squarely established by [the Supreme] Court.");

26   <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quoting <u>Musladin</u>, 549 U.S. at 77) ("Because

27   our cases give no clear answer to the question presented ... 'it cannot be said that the state court

28   unreasonabl[y] appli[ed] clearly established Federal law.' Under the explicit terms of §

1  2254(d)(1), therefore, relief is unauthorized." (internal quotation marks omitted)).

2      Moreover, the state court's determination that sufficient evidence supported the jury's

3  finding of competence was not unreasonable. The state court noted that although the two experts

4  testified that Petitioner was unable to rationally assist counsel in his defense, the jury was free to

5  accept or disregard their opinions. The court noted that both experts agreed that Petitioner was

6  able to understand the nature of the proceedings, the charges he faced, and the roles of the

7  attorneys, judge, witnesses, and jurors.  There was also evidence that Petitioner had the ability to

8  work with counsel if he so desired.  The experts noted Petitioner's frustrations that defense

9  counsel was not listening to him and did not follow through on his suggestions. The experts also

10  noted Petitioner was frustrated that counsel failed to investigate his alibi. This, however, does not

11  show Petitioner was unable to assist counsel; it instead shows that Petitioner failed to cooperate

12  with counsel by his own choice.  The record also reflects that Petitioner attempted on three

13  occasions to dismiss his attorney because of his frustrations in the handling of his defense.  This

14  further demonstrated that Petitioner could rationally assist counsel but chose not to do so.

15      There was also evidence of malingering.  One of the experts agreed "that it was 'difficult'

16  at times how to distinguish between someone who is choosing not to work with their attorney and

17  someone who has a mental disorder affecting their inability to do so."  Watson, 2023 WL

18  5496964, at *10. The expert noted that Petitioner had said at one point that, "if he committed the

19  crime as alleged, he would say he was crazy because he could get less time." Id.

20      Finally, two correctional officers who had continued, regular contact with Petitioner

21  testified that Petitioner never exhibited any abnormal behavior. Id. Petitioner was always

22  respectful and calm, and he maintained normal, casual conversations with others. Id. at 8.

23  Petitioner contends that the two correctional officers were not experts, and therefore, their

24  opinions were outweighed by the evidence of the experts.  However, this was a question for the

25  jury, and the jury rejected the experts' opinions.  It is not permissible for a reviewing federal

26  habeas court to reweigh the evidence to overturn the jury's findings. See 28 U.S.C. § 2254(e)(1).

27      In sum, Petitioner fails to present a cognizable federal claim. He also fails to demonstrate

28  that the state court decision was contrary to, or an unreasonable application of, Supreme Court

authority.  Based on the record, the Court also finds that Petitioner fails to show that the state

court's decision was an unreasonable determination of the facts. The claim should be denied.

### 2.  Claim Two

In his second claim, Petitioner again calls into question the issue of his competency to

stand trial. As to his ability to communicate with and rationally assist counsel in his own defense,

Petitioner alleges the trial court erred when it failed to provide further instruction, as requested by

the defense, on what constituted the term "rationally assist."  Petitioner also raised this claim on

direct review.  The Fifth DCA rendered the last reasoned decision, as follows:

> Watson next contends that the trial court erred in denying his request for a pinpoint instruction during the competency proceedings to clarify that "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. We find no error.
>
> *Background*
>
> The trial court instructed with CALCRIM No. 3451, which, as relevant here, instructed the jury that,
>
>> "[Watson] is mentally competent to stand trial if he can do all of the following: Number one, understand the nature and purpose of the criminal proceeding against him; number two, assist, in a rational manner, his attorney in presenting his defense, and; number three, understand his own status and condition in the criminal proceedings. [¶] The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is ... now mentally incompetent because of a mental disorder."
>
> During the competency proceedings, Watson requested the instruction be modified to define the term "rationally assist" as follows:
>
>> "Assist his attorney in presenting his defense means that the defendant has the ability to do the following: [¶] 1. Decide whether to remain silent or whether to testify about issues relevant to the charges. [¶] 2. Decide whether to put on a defense. [¶] 3. Decide whether to raise one or more affirmative defenses. [¶] 4. Help his attorney to identify possible witnesses. [¶] 5. Help his attorney to question the government witnesses about issues relevant to the charges. [¶] 6. Decide on overall trial strategy. [¶] If the defendant cannot assist his attorney in a rational manner because of a mental disorder, then you must find him to be incompetent."
>
> The People objected to the proposed instruction as unnecessary. The trial court rejected the proposed instruction "with respect to what it means to assist counsel in presenting a defense" because there "hasn't really been any testimony with respect to the details of what that means, and there wouldn't be any facts to back up any of this—any of the specific areas based upon what the defense has presented at this point." However, the trial court clarified that is would not preclude counsel from arguing "what those various things may be," and would revisit the issue if the jury

questioned the phrase. The jury did not submit any questions.

*Applicable Law and Analysis*

As noted above, "The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent." (*Buenrostro, supra*, 6 Cal.5th at p. 385.) The United States Supreme Court established the test for competence to stand trial in *Dusky, supra*, 362 U.S. 402: "it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " In California, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

CALCRIM No. 3451 is consistent with section 1367, and the California Supreme Court has held that even though section 1367 does not match the test articulated in *Dusky* word for word, "'"[t]o anyone but a hairsplitting semanticist, the two tests are identical."'" (*People v. Dunkle* (2005) 36 Cal.4th 861, 893 (*Dunkle*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *Buenrostro, supra*, 6 Cal.5th at p. 386.)

Watson argues that the trial court should have included an instruction to clarify that the "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. The California Supreme Court rejected the contention that CALJIC No. 4.10, which mirrors CALCRIM No. 3451, is deficient because it omits the requirements of "'a rational as well as factual'" understanding of the proceedings, as set forth in *Dusky*. (*Buenrostro, supra*, 6 Cal.5th at p. 390.) Like CALCRIM No. 3451, CALJIC No. 4.10 informed the jury that its task was to "'decide whether the defendant is mentally competent to be tried for a criminal offense'" and explained that "'a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against [him or her] if, one, [he or she] is capable of understanding the nature and purpose of the proceedings against [him or her]; two, [he or she] comprehends [his or her] own status and condition in reference to such proceedings; and, three, [he or she] is able to assist [his or her] attorney in conducting [his or her] defense in a rational manner.'" (*Buenrostro, supra*, at p. 385.) The Supreme Court held that the CALJIC No. 4.10 instruction was not infirm merely because it did not focus specifically on the defendant's "'rational and factual'" understanding of the proceedings. (*Buenrostro*, at p. 390.) It concluded that "'one's ability to grasp the nature of the proceedings necessarily encompasses one's capacity to have a rational and factual understanding of the proceedings.'" (*Ibid*.)

The Supreme Court also rejected a challenge to the CALJIC No. 4.10 instruction on grounds that it did not explain the various constitutional rights implicated in a criminal trial and failed to tell the jury how much and what kind of assistance a defendant must be able to provide counsel. (*Dunkle, supra*, 36 Cal.4th at p. 894.) In particular, the California Supreme Court held that the words "assist" and "rational manner" as used in the CALJIC No. 4.10 instruction were not technical terms that required instruction by the trial court. (*Dunkle*, at pp. 894–896.)

We conclude, consistent with *Buenrostro* and *Dunkle*, that the CALCRIM No.

1
2
3
4
5

> 3451 instruction given here adequately informed the jury of the required findings under section 1367. The requisite findings of Watson's ability to "understand the nature and purpose of the criminal proceedings against him," "assist, in a rational manner, his attorney in presenting his defense" and "understand his own status and condition in the criminal proceedings" described in CALCRIM No. 3451 encompassed Watson's ability to understand the facts of the case against him and his basic constitutional rights. The trial court did not err in refusing the requested pinpoint instruction.

6   Watson, 2023 WL 5496964, at *11-12.

7               a.      Legal Standard and Analysis

8   Although there is a constitutional right to a jury trial in criminal actions, there is no such

9   right in a competency proceeding. Drope v. Missouri, 420 U.S. 162, 172 (1973) (right to a jury

10  trial on competency stemmed from state law); Darrow v. Gunn, 594 F.2d 767, 774 (9th Cir. 1979)

11  ("there is no constitutional right to a jury in a hearing to determine competency to plead guilty or

12  stand trial"); White Hawk v. Solem, 693 F.2d 825, 829 (8th Cir. 1982). In California, the right to

13  a jury trial in a criminal competency proceeding is a statutory, not constitutional right. People v.

14  Masterson, 8 Cal.4th 965, 969 (1994). Therefore, the state court could not have unreasonably

15  applied Supreme Court authority where no such authority exists.

16  Likewise, there is generally no constitutional right to a pinpoint instruction, and a claim

17  that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v.

18  McGuire, 502 U.S. 62, 71-72 (1991).  Further, a petitioner's "burden is especially heavy [where]

19  no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely

20  to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

21  Since the Supreme Court has not found a constitutional right to a jury trial in a

22  competency hearing, or found that the failure to provide a pinpoint instruction implicates a

23  constitutional right, Petitioner cannot demonstrate that the state court's determination that the trial

24  court did not err by denying Petitioner's request for a pinpoint instruction was contrary to, or an

25  unreasonable application of, Supreme Court authority. The claim should be denied.

26               3.   Claim Three

27  Petitioner claims the trial court erred by giving instructions on "mutual combat"

28  and "pretextual" self-defense where said instructions were not supported by the evidence.

Petitioner also raised this claim on direct review.  The appellate court rendered the last reasoned decision, as follows:

> Watson next argues the trial court erred and violated his constitutional rights during the guilt phase of his trial by instructing the jury with CALCRIM Nos. 3471 and 3472. Watson contends the instructions were not supported by the evidence and that giving the instructions impermissibly deprived him of the ability to rely on self-defense or imperfect self-defense, violating his Sixth and Fourteenth Amendment rights to due process and to present a defense.
>
> Respondent argues Watson forfeited the claim by failing to object. If not forfeited, respondent contends there was no error, or that any error was harmless. Exercising our discretion to reach the merits, we find no reversible error.
>
> *Procedural background*
>
> During a discussion of proposed jury instructions, defense counsel requested instructions on self-defense (CALCRIM No. 505) and voluntary manslaughter/imperfect self-defense (CALCRIM No. 571). The trial court later inquired, "The self-defense, any questions to that one?" Defense counsel questioned if the trial court was "looking at 3471." The trial court replied, "Yes. 3471," and defense counsel stated, "No objection." The trial court then asked, "Same thing with 3472." And again, defense counsel stated, "No objection."
>
> CALCRIM No. 3471, as given, provided:
>
>> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>>
>> "1. He actually and in good faith tried to stop fighting;
>>
>> "2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; and
>>
>> "3. He gave his opponent a chance to stop fighting.
>>
>> "If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.
>>
>> "However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.
>>
>> "A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."
>
> CALCRIM No. 3472 as given, instructs that "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

24

1    _Standard of Review_

2    A trial court must give a requested instruction only if there is substantial evidence
     to support it, that is, evidence sufficient to deserve jury consideration. (_Marshall,_
3    _supra_, 15 Cal.4th at p. 39.) "Evidence is '[s]ubstantial' for this purpose if it is
     'sufficient to "deserve consideration by the jury," that is, evidence that a
4    reasonable jury could find persuasive.'" (_People v. Ross_ (2007) 155 Cal.App.4th
     1033, 1049–1050.) We review the propriety of a trial court's instructions de novo.
5    (_People v. Fiore_ (2014) 227 Cal.App.4th 1362, 1378.) A challenged instruction
     may not be judged in isolation but must be considered in the context of the
6    instructions as a whole. (_Ibid._) "'Jurors are presumed able to understand and
     correlate instructions and are further presumed to have followed the court's
7    instructions.'" (_Ibid._)

8    _Applicable Law and Analysis_

9    As a threshold matter, we address respondent's argument that Watson forfeited his
     contention by failing to object to the instructions below. We conclude that, while
10   Watson did forfeit his claims by failing to object, it is within our discretion to
     address his claim on the merits to determine whether there was an impairment of
11   his substantial rights. (_People v. Amezcua and Flores_ (2019) 6 Cal.5th 886, 916;
     _People v. Felix_ (2008) 160 Cal.App.4th 849, 858.) We do so here.
12
     Turning to the merits, we reject Watson's claim that the trial court erred by
13   instructing the jury with CALCRIM Nos. 3471 and 3472. Watson's argument that
     the instructions were not supported by substantial evidence relies almost
14   exclusively on his own theory of the case while essentially ignoring the reasonable
     inferences that can be drawn in support of the judgment. When all the evidence is
15   considered, and viewed in the light most favorable to the judgment, we conclude
     there was substantial evidence to support the challenged instructions.
16
     In particular, the evidence shows that Watson and D.A. were involved in an
17   altercation—with D.A. wanting Watson to drive and Watson wanting her out of
     his vehicle, or even that Watson was the initial aggressor. Watson told police that,
18   at Hales Cottage, D.A. came up to his truck and demanded a ride. When he
     refused, D.A. began kicking his truck and throwing rocks at it. Watson ended up
19   letting her into the truck, but said she was an "evil bitch," and, had she been
     bigger, he would have punched her. Watson acknowledged that, from the
20   beginning of their encounter, he was going to use "brute force" if he had to.

21   When D.A. pulled out a razor blade while in the vehicle, Watson became furious
     that D.A. was damaging his truck. He said his plan was to grab her hand, "jerk her
22   dumb ass out of my truck" and punch her in the mouth before driving away.
     According to Watson, the two wrestled and Watson was "pushing her harder" and
23   the gun went off. While Watson claimed he did not intend to shoot her, he did say
     he wanted to punch her in the mouth because she cut his seat belt. During Watson's
24   statements to law enforcement after the incident, he repeatedly voiced his disdain
     for D.A., at one point stating "that girl was evil. There was lot of people probably
25   wanted to kill that bitch."

26   On this record, there was substantial evidence that Watson was the initial
     aggressor and/or that he provoked the confrontation with the intent to create an
27   excuse to use deadly force. (See, e.g., _People v. Salazar_ (2016) 63 Cal.4th 214,
     222, 249–250; _People v. Enraca_ (2012) 53 Cal.4th 735, 761–762; _People v. Bolton_
28   (1979) 23 Cal.3d 208, 215; _People v. Eulian_ (2016) 247 Cal.App.4th 1324, 1334.)

1    Thus, it was not error to instruct the jury with CALCRIM Nos. 3471 and 3472.

2    Watson, 2023 WL 5496964, at *13-14.

3                          a.      Procedural Default

4    Respondent contends Petitioner is procedurally barred from raising this claim because he

5    failed to object to the instructions at trial.  As noted by Respondent, the state court found that

6    Petitioner had forfeited the claim.

7    A federal court will not review a claim of federal constitutional error raised by a state

8    habeas petitioner if the state court determination of the same issue "rests on a state law ground

9    that is independent of the federal question and adequate to support the judgment." Coleman v.

10   Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination

11   is based on the petitioner's failure to comply with procedural requirements, so long as the

12   procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the

13   bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

14   the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to

15   be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

16   1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it

17   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

18   alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

19   fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

20   The Ninth Circuit has repeatedly held that California's contemporaneous objection

21   doctrine is clear, well-established, has been consistently applied, and is an adequate and

22   independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

23   Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Thus, by failing to object to the instructions at

24   trial, Petitioner waived his claim in state court and is procedurally barred from raising it here.  In

25   any case, as discussed below, the claim is without merit.

26                          c.      Legal Standard

27   A claim that a jury instruction violated state law is not cognizable on federal habeas

28

review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation and must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

### d.   Analysis

In rejecting the claim, the state court first noted that Petitioner's arguments relied entirely on his own version of the events while ignoring the reasonable inferences that could be drawn in support of the verdict.  When considering the evidence as a whole, the state court determined that substantial evidence supported the instructions.  The state court's determination was not unreasonable.

The appellate court noted that Petitioner wanted the victim out of his truck, and Petitioner

acknowledged he would have punched her had she been bigger. He referred to her as an "evil

bitch" and acknowledged he would use "brute force" against her if he had to. (Doc. 11-36 at 27.)

He further told the investigating officer: "I was just gonna grab her by the hand, jerk her dumb ass

out of my truck and I was gonna drive away and I was gonna punch her in the fucking mouth."

(Doc. 11-36 at 51.)  Regarding the struggle, Petitioner also stated: "I was mad and I was just

fucking pushing her harder and then after I fucking got her out she fucking lunged at me again

and the fucking gun went off." (Doc. 11-36 at 59.) Later, he altered his account and stated he

fired the second shot intentionally to scare her. (Doc. 11-36 at 60, 73, 86.)  Finally, he told the

officers that the victim "was evil" and "[t]here was lot of people probably wanted to kill that

bitch." (Doc. 11-36 at 44.)

Based on this evidence, a jury could have drawn the inference "that Watson was the initial

aggressor and/or that he provoked the confrontation with the intent to create an excuse to use

deadly force." Watson, 2023 WL 5496964, at *14. Thus, Petitioner fails to demonstrate that the

state court's rejection of his claim was objectively unreasonable. The claim should be denied.

### 4.  Claim Four

In his last ground for relief, Petitioner contends the trial judge failed to exercise its

discretion and consider whether to strike or modify the firearm enhancements.  Petitioner raised

this claim on direct review.  The appellate court reviewed state law and determined that the

sentencing court had correctly applied the law in imposing the sentence.

The claim is not cognizable because habeas relief is not available to state prisoners

challenging state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times

that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d

1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in

federal habeas corpus" proceedings).  Petitioner challenges the state court's application of state

sentencing laws, and such a claim does not give rise to a federal question cognizable on federal

habeas review.  Lewis v. Jeffers, 497 U.S. 764 (1990); Sturm v. California Youth Authority, 395

F.2d 446, 448 (9th Cir. 1967) ("a state court's interpretation of its [sentencing] statute does not

raise a federal question").  The claim should be denied.

1    **IV.    RECOMMENDATION**

2          Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

3    Corpus be DENIED with prejudice on the merits.

4          This Findings and Recommendation is submitted to the United States District Court Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

6    Local Rules of Practice for the United States District Court, Eastern District of California.  Within

7    thirty (30) days after being served with a copy of this Findings and Recommendation, any party

8    may file written objections with the Court and serve a copy on all parties.  Such a document

9    should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

10   to the Objections shall be served and filed within fourteen (14) court days (plus three days if

11   served by mail) after service of the Objections.  The Court will then review the Magistrate

12   Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file

13   objections within the specified time may waive the right to appeal the Order of the District Court.

14   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  This recommendation is not an order that is

15   immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to

16   Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District

17   Court's judgment.

18

19   IT IS SO ORDERED.

20   Dated:   **August 22, 2024**                          */s/ Sheila K. Oberto*

21                                                   UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

                                                29